06-1867-cv
MLB Properties v. Salvino

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2006

(Argued: January 23, 2007            Decided: September 12,2008)

Docket No. 06-1867-cv

_____

MAJOR LEAGUE BASEBALL PROPERTIES, INC.,

Plaintiff-Counterclaim-Defendant-
Appellee,

- v. -

SALVINO, INC.,

Defendant-Counterclaimant-Appellant.
_____

Before:  KEARSE and SOTOMAYOR, Circuit Judges, and CEDARBAUM,

District Judge[*].

Appeal by defendant from so much of a judgment of the United States District Court for the Southern District of New York, Richard Conway Casey, Judge, as dismissed its counterclaim alleging that the organization and activities of plaintiff as the exclusive licensing agent for Major League Baseball intellectual property constitute a per se or "quick-look" violation of the Sherman Act, 15 U.S.C. § 1.  See 420 F.Supp.2d 212 (2005).

Affirmed.

_____

[*]    Honorable Miriam Goldman Cedarbaum, of the United States District Court for the Southern District of New York, sitting by designation.

Judge Sotomayor concurs, in a separate opinion.

JAMES T. McKEOWN, Milwaukee, Wisconsin (G. Michael Halfenger, Foley & Lardner, Milwaukee, Wisconsin, Gary A. Adler, Bingham McCutchen, New York, New York, on the brief), for Plaintiff-Counterclaim-Defendant-Appellee.

MAXWELL M. BLECHER, Los Angeles, California (John E. Andrews, Blecher & Collins, Los Angeles, California, on the brief), for Defendant-Counterclaimant-Appellant.

KEARSE, Circuit Judge:

Defendant Salvino, Inc. ("Salvino"), appeals from so much of a final judgment of the United States District Court for the Southern District of New York, Richard Conway Casey, Judge, as dismissed its counterclaims alleging that the organization and activities of plaintiff Major League Baseball Properties, Inc. ("MLBP"), as the exclusive licensing agent for Major League Baseball (or "MLB") clubs' intellectual property, violate § 1 of the Sherman Act, 15 U.S.C. § 1, and asserting "related state law claims" (Salvino brief on appeal at 2). The district court granted MLBP's motion for summary judgment dismissing those claims on the grounds that MLBP's operations should be analyzed under the rule of reason, and Salvino (a) failed to adduce evidence to show that the challenged organization and activities have an actual adverse effect on competition or that MLBP has sufficient market power to inhibit competition market-wide, and (b) failed to offer

any evidence to support its state-law claims. On appeal, Salvino challenges the dismissal of its § 1 antitrust claim, contending that the court should not have required evidence with regard to market power or actual adverse effect on competition but should instead have held MLBP's activities either illegal per se or illegal under a "quick-look" analysis. With regard to Salvino's state-law claims, its brief on appeal contains no argument as to why the district court's dismissal was incorrect, and we therefore regard any challenge to the dismissal of those claims as abandoned, see generally Hobbs v. County of Westchester, 397 F.3d 133, 147 (2d Cir.), cert. denied, 546 U.S. 815 (2005); Day v. Morgenthau, 909 F.2d 75, 76 (2d Cir. 1990); Fed. R. App. P. 28(a)(9). For the reasons that follow, we reject Salvino's contentions and affirm the dismissal of its antitrust claim.

## I. BACKGROUND

Viewed in the light most favorable to Salvino, as the party against which summary judgment was granted on the claim at issue on this appeal, the following facts are not in dispute.

A. The Parties and the Licensing Dispute

MLBP is a wholly-owned subsidiary of Major League Baseball Enterprises, Inc. ("MLBE"), an entity in which each of the 30

current MLB clubs (the "Clubs") owns an equal interest. MLBP is, with limited exceptions, the exclusive worldwide agent for licensing the use of all names, logos, trademarks, service marks, trade dress, and other intellectual property owned or controlled by the MLB Clubs, MLB's Office of the Commissioner ("BOC"), and MLBP (collectively "MLB Intellectual Property"), on retail products. MLBP also acts as agent for the Clubs with respect to, inter alia, trademark protection, quality control, design services, royalty accounting, and auditing.

Salvino is a California corporation that produces, sells, and distributes sports collectibles, including stuffed plush animals that are usually identified with sports celebrities. Between 1989 and 2001, Salvino obtained licenses from MLBP to use Club marks and other MLB marks on figurines of baseball players in uniform. In the license agreements, Salvino promised not to use the marks in any manner other than as licensed.

In the spring of 1998, Salvino developed a line of plush, bean-filled bears that it called "Bammers." Salvino obtained licenses for sports-personality Bammers from, inter alia, National Football League ("NFL") Properties, Inc., National Basketball Association ("NBA") Properties, Inc., National Hockey League ("NHL") Enterprises, L.P., the NHL Players' Association, and companies representing several professional figure skaters, as well as from various individual NBA players, retired NFL players,

current and retired MLB players, and drivers in the National Association for Stock Car Auto Racing ("NASCAR").

Salvino produced baseball Bammers without Club logos for sale to commercial outlets such as hobby shops, Hallmark stores, and other retail chains. In 1998 and/or 1999, it sold Bammers in uniforms bearing Club logos to at least seven MLB Clubs, and sold Bammers with Club logos only on the sales tags to two MLB Clubs, for retail sale in their stadia or for free stadium giveaways. Salvino obtained licenses to use baseball player names and numbers from the Major League Baseball Players' Association, Inc. ("MLB Players' Association"). However, despite discussing a possible license from MLBP for the use of MLB Club logos on Bammers in early 1999, the only license for a Bammer that Salvino obtained from MLBP was an April 1999 license for a Hank Aaron Bammer commemorating the 25th anniversary of Aaron's breaking Babe Ruth's home run record.

In October 1999, MLBP learned that Salvino had sold Bammers to the Arizona Diamondbacks baseball club with the Diamondbacks logo on them; Salvino had not obtained an MLBP license to use that logo. MLBP sent Salvino a cease-and-desist letter stating that Salvino was in violation of its existing license agreement with MLBP, in which "Salvino[ had] represent[ed] and warrant[ed] that it would not, during the license period or any license period thereafter, use the Logos except as licensed

under the [license a]greement" (Letter from MLBP to Salvino dated November 3, 1999, at 1). The letter stated that

> [i]n addition, the unauthorized use of the trademark constitutes trademark infringement. The Arizona Diamondbacks have informed [MLBP] that, although they reviewed artwork demonstrating the appearance of the proposed product, they never gave express consent to use the Arizona Diamondbacks'logo featured thereon, nor are they being compensated by Salvino (in the form of a royalty or otherwise) for the use of the Logo.

(Id. at 1-2.)

Salvino responded by commencing an action against MLBP and MLBE in federal court in California (the "California action"), alleging that MLBP's activities violated §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, as well as § 7 of the Clayton Act, 15 U.S.C. § 18, and various state laws. As it related to the § 1 claim, Salvino's complaint in that action alleged principally that

> [b]ecause [MLBP] distributes the income from its exploitation of trademarks equally to each member club--even though a relatively small number of clubs generate[s] the bulk of the revenue--the incentive of many major league clubs to invest in and promote and compete through its [sic] trademark has been diminished and suppressed. As a result, the [agreement between MLBP and the Clubs] . . . has reduced output, diminished the quality of product offered to the public, diminished the choice of product offered to the public, reduced and suppressed price competition leading to higher prices to the public and reduced market efficiency to the detriment of the public.

(Salvino's California action complaint ¶ 13.)

In April 2000, MLBP commenced the present action against Salvino, asserting claims under federal and state law for, inter

alia, trademark and trade dress infringement arising out of Salvino's unauthorized use of MLB marks. Salvino's California action was transferred to the Southern District of New York, where it was consolidated with the present action, with Salvino's California action claims becoming counterclaims in the present action.

B. MLBP's Motion To Dismiss Salvino's § 1 Counterclaim

Eventually, all of the parties' respective claims, except Salvino's counterclaims against MLBP for alleged violation of § 1 of the Sherman Act and for alleged unfair competition and tortious interference with contract under California and New York law, respectively, were either abandoned or settled. In the meantime, to the extent pertinent to this appeal from the district court's dismissal of Salvino's § 1 counterclaim, MLBP moved, following some three years of discovery, for summary judgment dismissing that claim.

In support of its summary judgment motion, MLBP submitted, pursuant to Rule 56.1 of the Local Rules for the Southern District of New York ("Rule 56.1" or "Local Rule 56.1"), a statement of facts that it contended were undisputed ("MLBP Rule 56.1 Statement"). MLBP contended that the undisputed facts, analyzed under the rule of reason, revealed that its conduct did not violate the Sherman Act. In support of its factual

assertions, MLBP generally cited documents (filed under seal, and hereby deemed unsealed to the extent described in this opinion), and submitted deposition testimony or sworn declarations to show the admissibility of the cited documents.

Salvino, in its response pursuant to Rule 56.1 ("Salvino Response"), principally took the position that many of the facts set out by MLBP, while expressly "undisputed," were "not material," apparently on the theory that rule-of-reason analysis was inappropriate. (Salvino also contended that some of the documents cited by MLBP were objectionable on grounds of hearsay and lack of foundation, objections that are unmeritorious (see

Part II.A.3. below).) The following facts, in addition to those described in Part I.A. above, are among those that are undisputed.

1. Major League Baseball

The Major League Baseball teams together produce an entertainment product--the "MLB Entertainment Product"--that consists of approximately 2,400 interrelated, professional baseball games per year played by the 30 MLB Clubs, leading to separate playoff games for the American and National Leagues and culminating each season with the World Series between the champion Clubs from the two Leagues. This entertainment product can be produced only by the Clubs operating together in the form of

a league; it cannot be produced by any one individual Club, or even a few Clubs. While squads of players from a single Club could play each other, the organization of the Clubs into a nationwide league with geographic diversity and a common championship goal, pursued in a structured manner employing uniform rules of play, has created a vastly different and more marketable product than is created by scrimmages between squads of players from a single Club or even by ad hoc "barnstorming" games between Clubs outside of a large league structure. (See Salvino Responses to MLBP Rule 56.1 Statement ¶¶ 41, 42.)

The MLB Entertainment Product, for which cooperation among the Clubs is essential, affects the value of MLB Intellectual Property. For example, during the baseball players' strike in 1994 and 1995, revenues generated by sales of MLBP-licensed products decreased; after the strike ended and MLB games resumed, those revenues increased. (See Salvino Responses to MLBP Rule 56.1 Statement ¶¶ 44, 45.)

2. MLBP's Licensing and Policing Activities

MLBP was incorporated in 1966 by the then-existing MLB Clubs (under the name Major League Baseball Promotion Corporation) as a wholly-owned subsidiary of MLBE. Each of the current MLB Clubs owns an equal interest in MLBE and shares equally in its profits. Prior to the formation of MLBP in 1966, there had been no

centralized source for the licensing of MLB Intellectual Property, a fact that was cited to MLBP by potential licensees as the reason for baseball's exclusion from certain marketing programs. (See Salvino Response to MLBP Rule 56.1 Statement ¶ 20.) For example, at a December 1966 meeting of the executive committee of MLBP's board of directors, representatives of the Coca-Cola Company described a football-related under-the-cap promotion that Coca-Cola had begun three years earlier with the NFL. The representatives stated that Coca-Cola had been unwilling to consider such a promotion using baseball team logos because MLB's structure, on a nationwide basis, was "'entirely too cumbersome.'" (Id. ¶ 22.) According to the minutes of that meeting, the representatives stated that Coca-Cola became willing to consider an under-the-cap promotion using MLB Intellectual Property once the company learned that the Clubs were creating an entity that could negotiate an agreement on behalf of all of the Clubs.

When created in 1966, MLBP was given (a) the exclusive right to market and promote the official name and logo of Major League Baseball, (b) a non-exclusive right to license the names and logos of the National and American Leagues, and (c) the right to submit licensing proposals for Club marks to the Clubs for their approval. (See Salvino Response to MLBP Rule 56.1 Statement ¶ 16.) Since 1984, MLBP's operations and the relationships between MLBP and the Clubs have been governed by a series of three-to-five-year

agency agreements, collectively called the "Agency Agreement." In 1984, the Agency Agreement increased MLBP's authority by giving it the exclusive right--subject to limited exceptions--to license Club names and logos for use on retail products for national and international (i.e., not merely local) distribution. (See id. ¶ 17.) In 1987, the Agency Agreement further expanded MLBP's authority, granting it the exclusive right (again with limited exceptions) to license Club names and logos for use on products to be sold at retail within the Clubs' respective local markets. (See id. ¶ 18.) Thus, since 1987, the retail sale of any products bearing an MLB Club's name or logos must be licensed by MLBP, even if the products are sold at a concession stand inside the Club's stadium. (See id. ¶ 11.)

From 1966 until 1987, MLBP had relied on the Licensing Corporation of America ("LCA") as its subagent to license MLB Intellectual Property. LCA, however, also marketed the intellectual property of a number of other groups, including the NHL and NHL teams. And, in addition, as a division of Warner Communications, LCA licensed intellectual property relating to numerous cartoon and comic book characters. (See Salvino Responses to MLBP Rule 56.1 Statement ¶¶ 23, 24.) In 1987, when MLBP's exclusive right to grant licenses for use of the Clubs' intellectual property on retail products was expanded to encompass the Clubs' respective local markets, MLBP ceased to grant licenses through LCA and began

licensing MLB Intellectual Property directly. (See id. ¶ 25.) In that year, total revenues from the licensing of MLBP Intellectual Property more than doubled; and between January 1, 1987, and October 24, 1988, MLBP increased the number of its licensees from 100 to 250. (See id. ¶¶ 26, 28.) By August 2003, when it filed its Rule 56.1 Statement, MLBP had outstanding more than 300 licenses for the production of some 4,000 different products for retail sale in the United States bearing or reflecting MLB Intellectual Property (see id. ¶ 35), and had issued licenses to some 170 licensees for such products to be sold outside of the United States (see id. ¶ 36).

The Agency Agreement and the Operating Guidelines that are incorporated in it leave the Clubs free to grant licenses with respect to their own intellectual property to a limited extent. For example, a Club is allowed to issue licenses for the use of its intellectual property on products that it gives away at a home game; intellectual property of the visiting Club in such a game may also be used on the "giveaway" product with the approval of the visiting Club and MLBP. (See Salvino Responses to MLBP Rule 56.1 Statement ¶¶ 12, 14.) No other MLBP license or approval is required for such giveaways so long as they do not include the marks of another MLB Club, MLBP, or the BOC. (See id.)

In addition, a Club may use its own marks or license others to use its marks to create home video products about the individual Club, to be sold or given away within the Club's home

broadcasting territory (as defined for each Club in the Operating Guidelines). MLBP licenses the use of BOC and MLBP marks for use in such home videos at the request of the Club. The Operating Guidelines also provide that a Club may license the use of its marks on hot dogs and similar items distributed or sold within its home broadcasting territory; MLBP has no authority to grant licenses for such items without obtaining the Club's prior approval. A Club also has the right, within its home broadcasting territory, to use and license others to use its marks to advertise and promote the Club's cruises and fantasy, educational, or summer camps.

Under the Agency Agreement, MLBP is also responsible for, inter alia, protecting and licensing logos and trademarks owned by the MLB Clubs, such as the "SF" logo of the San Francisco Giants, and protecting and licensing logos and trademarks owned by the BOC and MLBP itself, such as the "Major League Baseball" word mark, the World Series logos, and the famous silhouetted batter logo. (See Salvino Response to MLBP Rule 56.1 Statement ¶ 3.) The Agency Agreement provides that, as the exclusive licensor of the Clubs' intellectual property for use on products to be sold at retail, MLBP guarantees to the Clubs that all licenses will impose quality controls and will enhance the image of MLB, and that MLBP will protect and preserve the intellectual property of the Clubs and the goodwill that that property represents.

Infringing parties often use the trademarks of multiple

Clubs, with the result that more than one Club's intellectual property rights are infringed simultaneously. (See Salvino Response to MLBP Rule 56.1 Statement ¶ 66.) As a centralized licensing agent, MLBP is able to identify from its own records whether a particular product bearing MLB Intellectual Property is licensed and thus to determine efficiently whether or not it infringes on MLB Intellectual Property. (See id. ¶ 71.) In order to protect that property, MLBP sends or causes to be sent more than 100 cease-and-desist letters every year. (See id. ¶ 67.)

3.   The Market in Which MLBP Licenses Compete

MLBP asserted the view, which Salvino criticized as "a self-serving view," that other sports leagues such as the NBA, the NFL, the NHL, and the Women's National Basketball Association, as well as non-sports entertainment purveyors such as Nickelodeon and Disney, are among MLBP's competitors in the licensing of intellectual property for use on retail products. (See Salvino Responses to MLBP Rule 56.1 Statement ¶¶ 50, 52.) For example, Team Beans, a competitor of Salvino that obtained licenses for MLB Intellectual Property from MLBP for use on plush toys, also held licenses to use trademarks from a variety of other licensors, including the Olympics, the NFL, the NHL, the MLB Players' Association, and NASCAR. (See id. ¶ 57.)

A market research study conducted for MLBP, whose goals

included increasing game attendance, media audiences, and sales of MLB Intellectual Property, found that baseball does not compete with just one sport, or even only with sports. It found that the competitive arena for baseball is "'a wide range of leisure and entertainment options that vary with target group and lifestyle.'" (Salvino Response to MLBP Rule 56.1 Statement ¶ 55.) Thus, the MLBP 1996 Business Plans' list of MLBP's major competitors for intellectual property licensing included the following: branded apparel manufacturers such as Nike, Reebok, Russell, Champion, Big Dog, and No Fear; other sports entities such as the NBA, the NFL, the NHL, NASCAR, collegiate groups, and the 1996 Summer Olympics; and entities, such as Warner Brothers and Disney, that offered licenses to use intellectual property relating to, e.g., Looney Tunes, Power Rangers, Peanuts, Nickelodeon, Batman, SpaceJam, and Goosebumps. (See id. ¶ 56.)

In 1998, Salvino itself sold Bammers that were licensed by, among others, the MLB Players' Association, NFL Properties, Inc. ("NFL Properties"), and the NHL Players' Association. (See Salvino Response to MLBP Rule 56.1 Statement ¶ 101.) Salvino, which had had total sales of less than $1 million in 1997, developed the Bammer in the spring of 1998 and had revenues of $17 million from the sale of Bammers in 1998; in 1999, Salvino had revenues of $30 million. (See id. ¶¶ 100, 101, 102.)

In a September 1999 marketing plan that Salvino submitted

to MLBP, Salvino stated that it had sold Bammers licensed by the above sports organizations, as well as "Muhammad Ali" Bammers, Ice Bammers, and Basketball Bammers, and various other individually licensed Bammers. Seeking an MLBP license for MLB Intellectual Property for use on a photo ball and photo bat, Salvino stated that it proposed to sell those items in the same target market in which it sold Bammers. (See Salvino Response to MLBP Rule 56.1 Statement ¶ 107.) Salvino described its target market as retailers that have the potential to carry "sports licensed products." (Id.) Salvino stated that its primary targets included stadium concessionaires and sporting goods retailers and that its secondary targets were "retailers of licensed sport products who have the capacity to purchase in volume"; it stated that "'our most important competition comes from companies that currently distribute sports licensed products. These products compete directly for limited shelf space devoted to this product category.'" (Id.)

Thus, in addition to selling its Bammers to MLB Clubs and stadium concessionaires (see Salvino Response to MLBP Rule 56.1 Statement ¶ 112), Salvino sold Bammers to "hobby shops, sports collectible shops, Hallmark stores and retail chains" (id. ¶ 111). Rick Salvino, Salvino's president since 1988, testified that the Bammers competed with everything in the store for shelf space (see id. ¶¶ 93, 113): "'Everybody is a competitor. Anybody in a gift store that sells a product is a competitor of mine, because we're

all fighting for shelf space, for any store for that matter . . . .'" (Id. ¶ 114.) Wayne Salvino, Salvino's vice president from at least early 1989 until December 2001, testified that Salvino competed with numerous other producers of plush items, as well as "'anybody who produces sports licensed products; anybody who produces, you know, signed products, collectibles, memorabilia; anybody who produces licensed key chains, zipper pulls, non-licensed key chains, zipper pulls.'" (Id. ¶¶ 94, 116.) Similarly, in its sales presentations to the MLB Players' Association, NFL Properties, and NBA Properties, Inc. ("NBA Properties"), Salvino stated that the market for Bammers licensed by those sports organizations would be the "'sports collectibles hobby'" market. (Id. ¶¶ 117, 118, 119.) In its proposal to the MLB Players' Association, for example, it stated that "'[a]n additional market which would be targeted for distribution would be the general collectibles market. This market is represented by thousands of gift stores, specialty stores, major department stores, catalogs, and other forms of direct marketing through the mass media that currently market this category of product.'" (Id. ¶ 117.) The business plan that Salvino submitted to NFL Properties described Salvino's Bammers as falling within the "'novelty and memorabilia market.'" (Id. ¶ 118.) And in the plan it submitted to NBA Properties, Salvino stated that its products, including Bammers, were in both the "'sports collectibles hobby'" market and the "'general retail market.'" (Id. ¶ 119.) Salvino's

Bammers brochure declared Bammers to be "'America's Number 1 Sports Collectible'" with respect to its entire product line of Bammers, e.g., baseball, football, boxing, basketball, ice skating, hockey, and NASCAR. (Id. ¶ 120.)

MLBP also asserted, without meaningful disagreement from Salvino, that other professional sports groups, like MLB, employ centralized marketing entities. For example, Salvino did not dispute that the MLB Players' Association, the union that represents MLB players, states that it is the exclusive holder of all right, title, and interest in the group licensing of names, nicknames, likenesses, and signatures of any group of three or more active MLB players. (See Salvino Response to MLBP Rule 56.1 Statement ¶ 4.) Nor did Salvino dispute that, according to their respective standard licenses, (a) NFL Properties has the exclusive right to license for commercial purposes the trademarks of the NFL and its member teams; (b) NBA Properties has the exclusive right to license for commercial purposes the use of certain names, logos, symbols, emblems, designs, and uniforms, etc., of the NBA, along with the names, nicknames, photographs, likenesses, signatures, and other identifiable features of current NBA players; and (c) NHL Enterprises, L.P. ("NHL Enterprises"), has the exclusive right to license for commercial purposes the names, nicknames, logos, colors, and uniform designs, etc., of the member teams of the NHL, the numbers appearing on NHL players' uniforms, the name, initials, insignia, and other indicia

of the NHL itself, and the name and likeness of the Stanley Cup. (See id. ¶¶ 5, 6, 7.)

Wayne Salvino testified at his deposition that one advantage to Salvino of the NFL's centralized licensing structure was that NFL Properties offered a package of certain players and all team logos, allowing that entity to serve as a "'one-stop shop.'" (Salvino Response to MLBP Rule 56.1 Statement ¶ 49.)

#### 4. The Views of the Parties' Respective Economists

Toward the end of the discovery period, MLBP had taken the deposition of Salvino's expert economist, Louis A. Guth, who had prepared a report in which he opined that MLBP functions as an "economic cartel" (Expert Report of Louis A. Guth dated February 27, 2003 ("Guth Report"), ¶ 6; see, e.g., id. ¶¶ 17-19). The Guth Report stated that "MLBP quite likely exercises sufficient control over pricing licenses for use of club marks for plush toys and similar products so that these constitute a relevant market." (Id. ¶ 23.) In his deposition testimony, discussed in greater detail in Part II.C.4.c. below, Guth stated that MLBP limits output and sets prices (see generally Deposition of Louis A. Guth, March 26, 2003 ("Guth Dep."), at 140), and he opined that efficient licensing of MLB Intellectual Property could be accomplished through the use of less restrictive alternatives (see id. at 78-79). He testified that the relevant market could be determined by conducting a "discrete

choice survey" of consumers to determine whether changes in the prices of various products would affect the consumers' product preferences (id. at 25-27); however, Guth had conducted no empirical studies of any kind (see id. at 23-24, 34-36, 46, 50, 137-38).

MLBP, in support of its motion for summary judgment, presented the April 11, 2003 report of its expert economist, Professor Franklin M. Fisher ("Fisher Report"), analyzing MLBP's functions and the product market within which MLBP operates, and disputing the views of Guth. Fisher opined, inter alia, that MLBP is not a cartel and should instead be viewed as a joint venture; that the relevant product market consists at the very least of licenses for all sports and entertainment intellectual property, rather than just for MLB Intellectual Property; and that the centralization of MLB Intellectual Property licensing and other functions in MLBP produces procompetitive efficiencies.

Fisher pointed out that "[t]he customers [for] MLB Intellectual Property are prospective licensees that use MLB Intellectual Property to sell products." (Fisher Report ¶ 8.) Although Guth had suggested that the relevant market could be determined by conducting a survey to ascertain whether the product preferences of consumers were responsive to retail price variations, Fisher stated that "it is important to be clear that the relevant customers for MLB Intellectual Property are the prospective licensees of intellectual property and it is their demand and the

alternatives that _they_ face that determine the boundaries of the relevant market" (_id_. ¶ 18 (emphases in original)). "The demand of ultimate consumers for goods such as plush toys . . . that use intellectual property . . . is relevant only because such demand influences the derived demand of direct customers, the licensees." (_Id_.)

Fisher stated that "[a]vailable to these customers [_i.e._, potential licensees] is a wide array of intellectual property licensors, ranging from the different sports leagues, to entertainment companies like Warner Brothers and Disney, to clothing designers like Calvin Klein and Tommy Hilfiger, to name a few." (Fisher Report ¶ 8.) He opined that MLB competes with numerous other entertainment entities, including the NFL, the NHL, the NBA, and NASCAR, as well as Major League Soccer, the Professional Golfers Association, the Ladies Professional Golf Association, the Association of Tennis Professionals, the Olympics, motion pictures, television and radio programming, and a host of other sports and entertainment producers with respect to the licensing of intellectual property for retail products. (_See id_. ¶ 15.) He stated that "[t]he relevant antitrust market in which MLBP competes is the worldwide market for the licensing of intellectual property for use in the production of consumer goods and services"; but even if the market were defined "as only the licensing of the intellectual property related to sports and certain entertainment

products," MLBP lacks power in this relevant market. (Id. ¶ 10.)

Within the relevant market, Fisher opined that the interdependence of the MLB Clubs and the way in which MLBP operates reveal that MLBP functions as a joint venture, not a cartel:

> Despite Mr. Guth's assertion to the contrary, MLBP is not a cartel. Rather, it functions as a joint venture. Mr. Guth bases his conclusion that MLBP is a cartel on the observation that a cartel would seek authority over many of the same activities over which MLBP has authority. However, as Mr. Guth acknowledged at his deposition, this observation (or his characterization of MLBP as a "cartel") is an insufficient basis for concluding that MLBP is acting anticompetitively. This is because legitimate joint ventures need to have control over the very activities identified by Mr. Guth. Here, such control is necessary in order for the Clubs and the league as a whole to compete adequately against other sports and entertainment products. The MLB Clubs jointly produce their product and jointly create and enhance the value of MLB Intellectual Property. It is entirely natural and, indeed, procompetitive that they should exploit that value together . . . .

> 22. Mr. Guth states in his report that otherwise independent firms become "members of a cartel [and choose to] forego individual benefits [or their independence] in order to reduce competition among the members." By contrast, a joint venture consists of a group of interdependent firms that could not otherwise function as productively. Indeed, an important difference between a legitimate joint venture comprised [sic] of constituent parts and a cartel among competitors stems, in part, from the degree of integration among the constituent parts of the organization. Where the constituent parts of an organization are highly integrated and interdependent, it is appropriate to view the organization as a joint venture. Only where the constituent members of an organization are not highly integrated, but are independent sources of economic power with respect to the business of the entity, could it be appropriate to view the

organization as a cartel.

(Fisher Report ¶¶ 21, 22 (footnotes omitted) (emphases added).) Here, the Clubs are interdependent, even in relation to MLB Intellectual Property:

> [T]he value of MLB Intellectual Property is derived in large part from the value of the MLB Entertainment Product created jointly by Major League Baseball. As a result, the popularity, and hence any economic power, of a particular Club stems from, and is dependent on, the Club's membership in MLB and the marketing efforts of MLB. For example, no matter how successful the Yankees have been, the Yankees marks would have little value over time if the Yankees no longer competed with other Clubs in Major League Baseball. Indeed, the drop in popularity of former Club names, such as the Washington Senators, the Houston Colt 45s, and the St. Louis Browns, demonstrates this fact. The individual trademarks, trade dress, service marks, and other intellectual property that make up MLB Intellectual Property would have little or no value in the absence of their association with the MLB Entertainment Product. Thus, unlike a collection of otherwise independent firms that join together to form an anticompetitive cartel, MLB Clubs are highly interdependent.

(Id. ¶ 24.)

Fisher noted further that a cartel would seek to maximize its profits by charging high prices to some licensees and low prices to others, depending on the ease with which a particular licensee could substitute another product for that offered by the cartel. He pointed out that MLBP, in contrast, sets a standard royalty percentage for a product using a given type of any Club's intellectual property, irrespective of variations in the Clubs' popularity as reflected by their respective fan bases. (See Fisher

Report ¶ 29.)

> In this context, it is important to note that Major League Baseball fans are separable based on their loyalty to a particular Club. In this situation, a monopoly or cartel would surely set separate royalty rates to maximize profits. Contrary to the assertions of Mr. Guth, <u>the very fact that MLBP does not do this indicates that it faces competition from other entertainment products and is not a cartel</u>.

(<u>Id</u>. ¶ 30 (emphasis added).) In addition, while "a cartel serves to decrease output," MLBP had instead increased, not decreased, the retail sales of MLB-licensed consumer products. (<u>Id</u>. ¶ 27.) Fisher noted that MLBP business records showed that "[p]rior to the creation of MLBP, MLB had only limited commercial development and protection of its intellectual property." (<u>Id</u>.)

Fisher opined that the Clubs' use of MLBP "achieve[s] numerous efficiencies and procompetitive benefits that would not exist if each Club managed and licensed its intellectual property independently." (Fisher Report ¶ 31.) For example, benefiting the Clubs, MLBP negotiates and signs licenses on their behalf and manages the day-to-day relationships with the licensees. (<u>See</u> <u>id</u>. ¶¶ 33, 52.) Among the efficiencies benefiting licensees is the availability of "one-stop shopping," for no individual Club could grant a license to use the intellectual property of another Club or of MLBP or the BOC; in contrast, MLBP can grant a license for any one, or any combination, or all of those entities' intellectual property. (<u>Id</u>. ¶ 32.) Fisher stated that

> [i]n the absence of one-stop shopping, licensees

would incur substantial additional transaction costs; for some, these additional costs would be sufficiently large so as to prevent the licensees from producing some or all of the MLB-related products that they currently produce. Clubs would also incur greater expenses in the form of additional personnel costs to handle the added licensing functions for which they currently rely on MLBP and its centralized administration. Thus, <u>the absence</u> of one-stop shopping may well reduce output in the markets in which those licensees compete.

(<u>Id</u>. ¶ 34 (footnote omitted) (emphasis added).) In consequence, he concluded,

one-stop shopping helps broaden the product offerings of MLB Intellectual Property, both to include products that require the use of intellectual property of all 30 MLB Clubs as well as to include product lines that Clubs would normally not spend the money to develop or license. Because it has centralized control over all consumer product licenses, MLBP can ensure that MLB Intellectual Property is licensed for use on a broad array of consumer products. Over the years, this has meant that MLBP has licensed MLB Intellectual Property for use in products such as video games, women's apparel, and household goods. Given the difficulties associated with product licensing and administration, absent MLBP, it is unlikely that the Clubs would ensure such a broad product offering.

(<u>Id</u>. ¶ 37.)

Fisher also opined that centralization of MLB Intellectual Property licensing tasks in MLBP also creates efficiencies in quality control and in the effective protection of the Clubs' trademarks. For example,

[s]tate, federal and international laws require trademark owners to police and enforce their marks in order to retain them. The centralization of MLB Intellectual Property licensing enables MLBP to undertake extensive enforcement activities that the

- 25 -

individual Clubs would not have the capacity to undertake if left to protect their intellectual property o[]n their own. If the Clubs could not protect all of their intellectual property, they would risk losing some, if not a great deal, of those rights. Moreover, if those rights were not protected, the licenses for those rights would have much less value, if any value at all.

(Fisher Report ¶ 38; see also id. ¶ 39 (protection of MLB Intellectual Property against infringers also benefits MLBP's licensees, who would otherwise fear that their promotional efforts would be eroded by unfair competition from products that were unlicensed or counterfeit).) Having MLBP carry out the enforcement function avoids a multiplicity of overlapping efforts by the 30 Clubs to, for example, register all of their trademarks in each country in which such intellectual property might be used, and enforce their respective intellectual property rights throughout the United States and around the world. (See id. ¶¶ 41, 43.)

Fisher took issue with Guth's less-restrictive-alternatives hypothesis--referred to as a "but-for" world--in which Guth proposed that each of the 30 Clubs would negotiate its own licensing agreements, set its own royalty rates, and perform its own quality control, and MLBP would be responsible only for enforcement, maintaining a centralized database of royalty rates and payments, and acting essentially as a referral service for prospective licensees. (See Fisher Report ¶ 76.) Fisher stated that centralized licensing

simplifies the task of determining whether a

potentially infringing product is in fact licensed by MLBP or the Clubs. Responsible for retail product licensing, MLBP knows from its own records and history whether or not a particular product is licensed. In the apparent "but-for" world envisioned by Mr. Guth, where MLBP would retain only certain of its functions, MLBP would either need to track all licenses entered into by any Club or to contact every Club in order to determine whether products bearing Club marks are licensed or counterfeit. This significantly adds to the cost of enforcement. In addition, Mr. Guth's scenario ignores that time is often of the essence when dealing with enforcement activities, in that there is often a need to respond immediately to a call or complaint about counterfeit goods.

(Id. ¶ 42.)

Further, as to quality control, Fisher maintains that centralization of licensing in MLBP benefits the licensees of MLB Intellectual Property because they are, inter alia, able to obtain the necessary quality approvals from a single source, rather than having to obtain approvals from myriad separate control centers, including from some Clubs that may take lengthy periods of time to respond. (See Fisher Report ¶ 49.) In addition, licensees can be confident that all MLBP licensees will be held to the same standard, thereby eliminating the possibility that competitors who are less quality-oriented will free-ride on the efforts and investments of licensees who are conscientious. (See id.) Centralized quality monitoring also benefits the Clubs and MLB because it assures a uniform standard of excellence that will reflect appropriately on the image of Major League Baseball and each of the MLB Clubs. (See id. ¶ 46.)

- 27 -

According to Fisher, use of MLBP for centralized licensing also provides other efficiencies, administrative and creative. For example, having developed substantial expertise as to how well various product lines are likely to succeed in the marketplace, MLBP spends substantial time working with its licensees to help them develop new products and determine how best to market their existing products. (See Fisher Report ¶ 52.) Centralization in MLBP avoids the necessity for each of the 30 individual Clubs to spend the time and money that would be needed to develop its own sales and marketing expertise in order to provide sales and marketing support to licensees of Club intellectual property. (See id. ¶ 58.) The use of a central repository where licensees report sales and pay royalties also avoids the need for each Club to develop and maintain its own collection system, as well as the need for licensees to learn varied reporting requirements that would likely be entailed by different royalty rates for each Club and to keep track of the multiple royalties required for products that use more than one mark. (See id. ¶ 60.)

Fisher opines that all of the efficiencies gained by the centralization in MLBP of the licensing, enforcement, monitoring, and administrative functions with respect to MLB Intellectual Property

> translate directly into cost savings that can be passed on to licensees and, in turn, consumers of MLBP licensed merchandise. If Clubs were to handle these functions separately, their costs would

- 28 -

increase and, consequently, so too would the royalty rates needed to recoup these costs. Indeed, higher costs would force Clubs to either raise their royalty rates or simply decide not to license certain products out of concern for covering costs.

(Fisher Report ¶ 31; see also id. ¶¶ 41, 50.)

Finally, Fisher also opined that because the value of MLB Intellectual Property is dependent on the popularity of the MLB Entertainment Product, and the popularity of the MLB Entertainment Product depends in turn on the integrated efforts of the Clubs, the absence of centralized licensing could lead to various occurrences of what economists refer to as the "free-rider" problem, i.e., one entity's cashing in on the efforts of another. For example, if the Clubs granted licenses directly, a Club that was popular because of its on-field success could cash in on its popularity even though its victories obviously could not have been achieved without the participation of other Clubs. Or if a Club granted a license to one entity to use its logo on a certain product and MLBP granted such a license to a competing entity for the same product, and only one of the licensees invested in the promotion of that product, the non-promoting licensee would gain sales based on the conscientious licensee's efforts. (See Fisher Report ¶¶ 67-70.)

Fisher concluded that Guth's view that individual Clubs should set their own royalty rates, thereby allowing the more popular Clubs to set higher rates than the less popular Clubs, ignored the interdependence of the Clubs in providing the MLB

- 29 -

Entertainment Product and the need for

> competitive balance, which reflects the expected equality of opportunity to compete and prevail on the field. Competitive balance also relates to the fans' expectations that each team is a potential champion--i.e. that each Club has a reasonable opportunity to win each game and also to compete for a championship.

(Fisher Report ¶ 14.) "Mr. Guth's preferred distribution of licensing royalties would foster a competitive imbalance by over-compensating the popular team for the joint efforts of all Clubs." (Id. ¶ 81.) The resulting imbalance would "ultimately harm all Clubs by leading to a less interesting MLB Entertainment Product, which would make it difficult for MLB to compete against other sports and entertainment products." (Id.)

Salvino, in opposition to MLBP's summary judgment motion, submitted a rebuttal report and declaration by Guth in response to the Fisher Report (see Expert Rebuttal Report of Louis A. Guth dated May 8, 2003 ("Guth Rebuttal Report"); Declaration of Louis A. Guth dated September 22, 2003 ("Guth Decl.")), reiterating views set out in the initial Guth Report (see, e.g., Guth Decl. ¶¶ 2, 6). Guth argued that the efficiencies and procompetitive effects that the Fisher Report opined resulted from centralization of MLB Intellectual Property licensing in MLBP could be achieved by less restrictive means. (See, e.g., id. ¶¶ 8-18.)

Salvino presented no factual evidence to refute the evidence cited in MLBP's summary judgment motion. For example,

while Salvino posited that any increased licensing by MLBP was caused simply by a boom in consumer demand (see, e.g., Salvino Responses to MLBP Rule 56.1 Statement ¶¶ 34-36), citing paragraph 4 of the Guth Declaration, the Declaration cited no facts, did not opine as to causation, and was equivocal as to whether there had even been such an increase in demand. That paragraph stated only that the increases in the number of licenses granted by MLBP over the years "would appear to be more consistent with a general increase in consumer interest in licensed retail merchandise of all sorts" (Guth Decl. ¶ 4 (emphasis added)), and then stated that MLBP's increase in revenues "may well not reflect higher demand," but might instead reflect higher prices resulting from "an overall shift out in demand for such merchandise" (id. (first emphasis in original; second emphasis ours)).

Instead of attempting to show that there were genuine disputes of material fact, Salvino took the position that MLBP's factual evidence, submitted in support of rule-of-reason analysis, was largely irrelevant. It urged the court, instead of applying the rule of reason, to apply the per se or "quick-look" standard of liability.

C. The Decision of the District Court

In an Opinion and Order dated November 16, 2005, reported at 420 F.Supp.2d 212, the district court granted MLBP's motion for

summary judgment dismissing Salvino's § 1 counterclaim.  The court noted that on a motion for summary judgment, once the moving party has proffered facts to show that there is no genuine issue as to any material fact and that that party is entitled to judgment as a matter of law, "the opposing party must present 'specific facts showing [that] there is a genuine issue for trial.'"  420 F.Supp.2d at 218 (quoting Fed. R. Civ. P. 56(e)).  "[T]he non-moving party 'may not rely on conclusory allegations or unsubstantiated speculation.'" 420 F.Supp.2d at 218 (quoting Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998)).

As a matter of substance, the court began by rejecting Salvino's contentions that the operations of MLBP as centralized licensor should be ruled illegal per se.  It noted that "[f]or conduct to be illegal per se, it must fall within the narrow range of behavior that is considered so plainly anti-competitive and so lacking in redeeming pro-competitive value that it is presumed illegal without further examination."  420 F.Supp.2d at 219 (internal quotation marks omitted).  "Restraints such as price fixing, market divisions, tying arrangements, and group boycotts have all been found to be unreasonable in and of themselves."  Id. (internal quotation marks omitted).  The district court noted that the Supreme Court in Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1 (1979) ("Broadcast Music"), had "found that the [defendants'] blanket licensing arrangement was not per se

unlawful because it was 'not a naked [restraint] o[f] trade with no purpose except stifling of competition, but rather accompanies the integration of sales, monitoring, and enforcement against unauthorized copyright use.'" 420 F.Supp.2d at 219 (quoting Broadcast Music, 441 U.S. at 20) (other internal quotation marks omitted).  The district court stated,

> [s]imilarly, this Court finds that MLBP's role in licensing MLB intellectual property is not a naked restraint on trade.  Like the license agreement in Broadcast Music, it also facilitates the efficient protection and quality control of MLB intellectual property.

420 F.Supp.2d at 219.  The district court noted in addition that courts have refused to apply the per se rule of liability to sports leagues because cooperation among teams, in addition to any anticompetitive effects, can have legitimate purposes, such as enabling and coordinating the contests.  See id.

The district court also rejected Salvino's contention that the centralization of licensing in MLBP should be held illegal on a quick-look analysis.  Under quick-look analysis, a practice may be held illegal

> "[if] an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." . . .  The "quick-look analysis carries the day when the great likelihood of anticompetitive effects can easily be ascertained." . . .  It is not appropriate, however, where the anticompetitive effects of an agreement are not obvious or [the agreement] may "have a net procompetitive effect, or possibly no effect at all on competition."

Id. at 220 (quoting California Dental Ass'n v. FTC, 526 U.S. 756, 770, 771 (1999)). The court found quick-look analysis inappropriate in the present case.

> MLBP's expert identifies several procompetitive justifications for MLBP's arrangement, including the benefits of one-stop shopping for MLB intellectual property . . . and the efficiencies of enforcement, quality control, and coordinated promotion, design, sales, and marketing support . . . . While Salvino's expert conclusorily disagrees with MLBP's expert's opinion . . . , MLBP's proffer demonstrates that the quick look doctrine is inappropriate here since the casual observer could not summarily conclude that MLBP's arrangement has an anticompetitive effect on customers.

420 F.Supp.2d at 220.

Rather, the court concluded that MLBP should be evaluated "[u]nder a rule of reason analysis, which is applied 'where[] the economic impact of certain practices is not immediately obvious.'" Id. at 219 (quoting FTC v. Indiana Federation of Dentists, 476 U.S. 447, 459 (1986)). Under this analysis, "conduct will be deemed illegal only if it unreasonably restrains competition." 420 F.Supp.2d at 219 (internal quotation marks omitted).

The district court noted that when a challenged practice is subject to rule-of-reason analysis, the antitrust claimant bears the initial burden of showing an actual adverse effect on competition in the relevant market. See id. If the plaintiff meets that burden--which cannot be met merely by a showing that the plaintiff has been harmed as an individual competitor--the burden shifts to the defendant to offer evidence of the procompetitive

effects of its agreement; if the defendant offers such evidence, the burden then shifts back to the plaintiff to prove that any legitimate competitive benefits provided by the defendant could have been achieved through less restrictive means. See id. at 220. "'Ultimately, the factfinder must engage in a careful weighing of the competitive effects of the agreement--both pro and con--to determine if the effects of the challenged restraint tend to promote or destroy competition.'" Id. (quoting Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc., 386 F.3d 485, 507 (2d Cir. 2004)).

The court found that Salvino had not met its initial burden under rule-of-reason analysis, noting first that Salvino had pointed to no evidence to indicate that MLBP's licensing authority had an adverse effect on competition:

> The mere fact that Salvino did not receive an MLBP license for its Bammers is not sufficient. [K.M.B. Warehouse Distributors, Inc. v. Walker Manufacturing Co., 61 F.3d 123, 127 (2d Cir. 1995)] (explaining "the plaintiff must show more than just that he was harmed by defendants' conduct"). Salvino has not offered any evidence of an adverse effect on competition resulting from MLBP's licensing authority. Indeed, Salvino did not respond to MLBP's arguments regarding the rule of reason analysis and instead urged the Court to analyze its claims under the per se rule or quick look doctrine, neither of which would require Salvino to make a showing of adverse effect on the market. Further, Salvino does not dispute MLBP's stated increase in MLBP-licensed products since MLBP took over licensing authority for MLB intellectual property. (MLBP 56.1 Stmt. ¶¶ 26-36.) Salvino only takes issue with MLBP's proffered reasons for the increase, i.e., it claims the increase is a product

of the "licensing boom" and not a result of MLBP's centralized process. (Salvino Resp. to MLBP 56.1 Stmt. ¶ 29.)

420 F.Supp.2d at 220-21 (emphases added).

The court observed that "'[w]here the plaintiff is unable to demonstrate such actual effects . . . it must at least establish that defendants possess the requisite market power and thus the capacity to inhibit competition market-wide.'" Id. at 221 (quoting K.M.B. Warehouse Distributors, Inc. v. Walker Manufacturing Co., 61 F.3d at 129) (other internal quotation marks omitted). However, the court found that Salvino had also failed to adduce any evidence as to MLBP's market power or the relevant market, and it rejected Salvino's contention that such evidence was not required:

Salvino argues that a showing of market power is unnecessary . . . and dismisses as immaterial MLBP's attempts to define the relevant market . . . . Salvino cannot escape its burden of demonstrating MLBP's market power in light of its inability to demonstrate an actual adverse effect on competition. . . . The Court finds that Salvino has failed to offer any evidence of MLBP's actual adverse effect on the market or its sufficient market power. Accordingly, Salvino cannot demonstrate under the rule of reason that MLBP places unreasonable restraints on trade. MLBP's motion for summary judgment on Salvino's § 1 Sherman Act claim is granted.

420 F.Supp.2d at 221 (emphasis added).

A consent judgment was entered in March 2006, reflecting, inter alia, the dismissal of all of Salvino's claims and Salvino's reservation of the right to appeal the entry of summary judgment dismissing its antitrust counterclaim under § 1 of the Sherman Act.

- 36 -

## II.  DISCUSSION

On appeal, Salvino contends that the district court erred in ruling that the centralization in MLBP of the licensing of MLB Intellectual Property for use on retail products is to be analyzed under the rule of reason.  Salvino principally adheres to the contention on which it relied in the district court, i.e., that MLBP's operations should be evaluated only under a stricter standard--either the per se standard or the "quick-look" standard--and that under those stricter standards, summary judgment was inappropriate.  In support of this contention, it characterizes the Clubs' agreement to make MLBP their exclusive licensor as "naked horizontal price and output restrictions [that] traditionally fall[] within the per se proscriptions."  (Salvino brief on appeal at 20.)

Given that what Salvino refers to as "price" fixing is in fact profit sharing by interdependent entities (see Part II.C.2. below), and that Salvino adduced no evidence of any reduction of or agreement to reduce "output" (see Part II.C.1. below), we conclude, for the reasons that follow, that the district court properly applied the rule-of-reason standard and that under that standard Salvino failed to show any genuine issues to be tried.

A.  Summary Judgment Principles

Summary judgment is appropriate when the pleadings and

admissible evidence proffered to the district court show that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the district court may rely on "'any material that would be admissible or usable at trial.'" Azrielli v. Cohen Law Offices, 21 F.3d 512, 517 (2d Cir. 1994) (quoting 10A C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2721 at 40 (2d ed. 1983)); see, e.g., Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997). In determining whether the moving party is entitled to judgment as a matter of law, the court must resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

We review a district court's summary judgment decision de novo "to ensure," in an antitrust case, "that the substantive antitrust law was correctly applied." Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 95 (2d Cir. 1998). Summary judgment is of particular importance in the area of antitrust law, because it helps to "avoid[] wasteful trials and prevent[] lengthy litigation that may have a chilling effect on pro-competitive market forces." Id.; see also Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1966 (2007) (reversing denial of motion to dismiss antitrust complaint pursuant to Fed. R. Civ. P. 12(b)(6) and stating that "when the

allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court" (internal quotation marks omitted)).

1. Facts, Personal Knowledge, and Expert Opinions

Where a summary judgment motion is supported or opposed by affidavits, those "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). "'[H]earsay testimony . . . that would not be admissible if testified to at the trial may not properly be set forth in [the Rule 56(e)] affidavit.'" Beyah v. Coughlin, 789 F.2d 986, 989 (2d Cir. 1986) (quoting 6 Moore's Federal Practice ¶ 56.22[1], at 56-1312 to 56-1316 (2d ed. 1985)); see, e.g., Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 160 (2d Cir. 1999); Contemporary Mission, Inc. v. United States Postal Service, 648 F.2d 97, 105 n.11 (2d Cir. 1981).

In order to defeat a properly supported summary judgment motion, the opposing party must proffer admissible evidence that "set[s] forth specific facts" showing a genuinely disputed factual issue that is material under the applicable legal principles. Fed. R. Civ. P. 56(e); see, e.g., Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004); Meiri v. Dacon, 759 F.2d 989, 998 (2d

Cir.), cert. denied, 474 U.S. 829 (1985); 10B C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2738, at 346-56 (3d ed. 2006). A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory, see, e.g., Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996), or based on speculation, see, e.g., id. ("Though we must accept as true the allegations of the party defending against the summary judgment motion, drawing all reasonable inferences in his favor, . . . conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment."); ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 151 (2d Cir.) ("conclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment"), cert. denied, 128 S. Ct. 288 (2007); McPherson v. New York City Department of Education, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("speculation alone is insufficient to defeat a motion for summary judgment"); Bickerstaff v. Vassar College, 196 F.3d 435, 452 (2d Cir. 1999) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."), cert. denied, 530 U.S. 1242 (2000).

Under Fed. R. Evid. 702, an expert witness, unlike a lay witness, is "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592 (1993). "Faced with a proffer of expert scientific testimony, . . . [a] trial judge must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Id. (footnote omitted). "The subject of an expert's testimony must be 'scientific . . . knowledge.' The adjective 'scientific' implies a grounding in the methods and procedures of science." Id. at 589-90 (quoting Fed. R. Evid. 702) (footnote omitted). The Daubert principles apply not only to testimony based on "'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge. See Fed. Rule Evid. 702." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999).

Under Daubert, "the district court functions as the gatekeeper for expert testimony," Raskin v. Wyatt Co., 125 F.3d at 66, whether proffered at trial or in connection with a motion for summary judgment, see, e.g., Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 22 (2d Cir. 1996). At trial, proffered "expert testimony should be excluded if it is speculative or conjectural," id. at 21; the "[a]dmission of expert testimony based on speculative assumptions is an abuse of discretion," id. at 22. An expert's opinions that are without factual basis and are based on speculation or conjecture are similarly inappropriate material for consideration on a motion for summary judgment. See, e.g., Raskin v. Wyatt Co.,

125 F.3d at 66 ("[A]n expert's report is not a talisman against summary judgment."). An expert's conclusory opinions are similarly inappropriate. See, e.g., Bridgeway Corp. v. Citibank, 201 F.3d 134, 142 (2d Cir. 2000) (where the issue was the fairness of Liberian proceedings leading to a judgment, an expert's statement that "'Liberia's judicial system was and is structured and administered to afford party-litigants therein impartial justice'" was "purely conclusory" and hence insufficient to defeat summary judgment).

In the present case, Salvino contends that summary judgment should not have been granted because "there is a triable factual dispute as evidenced by the conflicting conclusions of the two economists"--i.e., MLBP's Fisher and Salvino's Guth--with respect to whether the agreement to use MLBP as the exclusive licensor of the Clubs' intellectual property "produced procompetitive efficiencies." (Salvino brief on appeal at 24 (internal quotation marks omitted).) Salvino offers no citation, however, to any statement by Guth indicating that centralization of licensing in MLBP does not provide procompetitive efficiencies, and we see only the following Guth statement on this question: "I conclude that the transaction cost efficiency argument advanced by MLBP is unsupported by the facts as I understand them and ought to be dismissed." (Guth Report ¶ 8.) This statement, which is entirely conclusory, was neither accompanied by any evidentiary

citation nor followed by any elaboration as to the procompetitive efficiencies described in the Fisher Report. Indeed, Guth testified that he had performed no empirical studies relating to "the possible extent of economic benefits." (Guth Dep. at 23-24.)

Instead, the Guth Report proceeded to hypothesize solely about direct licensing. And even as to direct licensing by the Clubs, which the Report opined would not "be overly burdensome" (Guth Report ¶ 8), Guth did not cite either (a) any evidence indicating that a prospective licensee could nearly as easily deal with 30 Clubs as with one centralized agency, a proposition that not only is counterintuitive but also ignores the testimony of Salvino itself that it is an advantage to be able to obtain sports intellectual property licenses for different team logos from a "one-stop shop" (Salvino Response to MLBP Rule 56.1 Statement ¶ 49 (internal quotation marks omitted)); or (b) any evidence that each MLB Club could, without incurring significantly greater expense, develop the staff and expertise necessary to negotiate with and monitor the performances of the hundreds of licensees now dealt with by MLBP.

The Fisher Report, which described at length several procompetitive efficiencies resulting from the centralization of licensing in MLBP (see Part I.B.4. above), was annotated with citations to documents and interviews of MLBP Clubs' personnel who had firsthand knowledge. The district court found in Guth's

assertions no basis for denying summary judgment, stating that Guth "conclusorily disagree[d] with" Fisher, 420 F.Supp.2d at 220. The district court did not err in this assessment.

2. Local Rule 56.1

In aid of the district court's determination as to whether there exist any genuine disputes as to facts that are material, Rule 56.1 requires the party moving for summary judgment to submit a statement of the material facts that it contends are not genuinely in dispute, see Local Rule 56.1(a), and requires that the opposing party submit a statement showing which of the moving party's factual assertions it disputes, see Local Rule 56.1(b). Subsection (c) of Rule 56.1 provides that

> [e]ach numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.

Local Rule 56.1(c).

Under Rule 56, it is the court's responsibility to determine whether the opposing party's response to the assertion of a material fact presents a dispute that is genuine. See generally 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2725, at 423 (3d ed. 2006). In the present case, Salvino's responses to the MLBP Rule 56.1 Statement require attention to

- 44 -

questions of admissibility of evidence and genuineness of dispute.

### 3. Salvino's Objections to Admissibility

Many of Salvino's responses to the MLBP Rule 56.1 Statement, while admitting that the facts asserted by MLBP were "undisputed," suggested that the evidence cited to support those facts was inadmissible, stating that MLBP's assertions were "not material" and that those assertions (or the documents cited to support them) were hearsay, speculative, or lacked foundation. Its objections were implicitly overruled by the district court. We see no error.

Most of the documents cited by MLBP in support of its Rule 56.1 assertions are MLBP business records. Contemporaneous business records made "by, or from information transmitted by, a person with knowledge," and "kept in the course of a regularly conducted business activity" by a business whose "regular practice" it was to make and keep such records, Fed. R. Evid. 803(6), are admissible as an exception to the hearsay rule, see id. The foundation for the admission of the MLBP business records was laid in several sworn declarations submitted by MLBP with its summary judgment motion.

For example, MLBP, citing the minutes of a meeting of MLB Club owners and an MLBP financial record, stated that in 1987, i.e., the year in which MLBP ceased to rely on LCA as a subagent for purposes of licensing MLB Intellectual Property, MLBP's total

licensing revenue from sales of products bearing MLB Intellectual Property more than doubled. Salvino responded, **"UNDISPUTED** that the memos and minutes so state. The cited evidence is hearsay and lacks foundation." (Salvino Response to MLBP Rule 56.1 Statement ¶ 26.) However, MLBP's summary judgment motion was accompanied by, inter alia, the sworn declaration of its Senior Vice President and General Counsel Ethan G. Orlinsky ("Orlinsky Declaration"), stating, "of [his] own personal knowledge," that those documents were "true and correct copies of documents that were maintained as records at MLBP. These documents were created and/or received in the ordinary course of MLBP's business, and were retained as part of MLBP's standard business practice" (Orlinsky Declaration dated August 22, 2003, ¶¶ 1, 21). Hence, Salvino's objections lacked merit.

The Orlinsky Declaration likewise identified as such a business record an October 24, 1988 memorandum from an MLBP vice president to MLB Commissioner-elect Bart Giamatti, attaching a status summary ("October 24, 1988 Status Summary" or "Status Summary") with respect to MLBP licensing and the progress achieved since "[r]etail [p]roduct [l]icensing was brought 'in-house' in January 1987" after "17 years [of licensing through] Licensing Company of America (Division of Warner Communications)." (October 24, 1988 Status Summary at 2.) The Status Summary stated, inter alia, that since January 1, 1987, MLBP's licensees had increased from 100 to 250 and that the number of licensee audits had increased

from 4 to 36 per year. (See id.) In response to an assertion in the MLBP Rule 56.1 Statement, citing the Status Summary, that "[b]etween January 1, 1987 and October 24, 1988, MLBP increased the number of its licensees from 100 to 250," Salvino stated as follows:

> **UNDISPUTED** that the documents so state, but not material. Any increase was caused in large part by the logo licensing boom that was prevalent at the time, not by the pooling arrangement, and MLBP does not point to any evidence that increases came at the expense of competitive rivals in a relevant market. See Guth Decl. ¶ 4. Moreover, even if it is economical to streamline some functions, it does not justify an agreement by MLB teams to forego their own output and to divide profits rather than compete. (Id. ¶¶ 8-11.)[] The cited evidence is hearsay, speculation and lacks foundation.

(Salvino Response to MLBP Rule 56.1 Statement ¶ 28.) These objections fail in light of the Orlinsky Declaration and the nature of the document.

Similarly, in response to MLBP's quotation from a 1984 MLBP memorandum describing the early licensing experiences of MLBP and its predecessor, stating that prior to centralization of licensing, Club marks were largely unprotected and had little commercial value, Salvino stated that it was **"UNDISPUTED** that the memo so states. The memo, however, is hearsay and lacks foundation." (Salvino Response to MLBP Rule 56.1 Statement ¶ 19.) However, MLBP's summary judgment motion was accompanied by the sworn declaration of Joseph L. Podesta, who had been an employee of MLBP from November 1972 until October 1985, serving as its president from 1975 to October 1985. (See Declaration of Joseph L. Podesta dated

August 21, 2003, ¶ 2.) In his declaration, Podesta stated that as MLBP's president, he had helped to prepare the memorandum "in the ordinary course of MLBP's business" for the purpose of helping to "educate Mr. Peter Ueberroth, the incoming Commissioner of Baseball, about the operations and history of MLBP"; Podesta had "signed the report . . . and kept a copy in [his] files at MLBP." (Id. ¶ 7.)

The Orlinsky Declaration also provided the foundation for the admission of other MLBP business records, including the minutes of the 1966 MLBP executive committee meeting at which representatives of the Coca-Cola Company stated that that company's earlier under-the-cap promotion with the NFL had excluded baseball because MLB lacked centralized licensing capability (see Part I.B.2. above). Although Salvino objected on hearsay and foundation grounds to these minutes (see Salvino Response to MLBP Rule 56.1 Statement ¶ 22), the minutes themselves plainly are admissible as a business record under Rule 803(6). Further, considering the minutes' description of the Coca-Cola representatives' statements solely as proof of what the MLBP executive committee was told, we note that those statements do not fall within the definition of hearsay, see Fed. R. Evid. 801(c).

Finally, we note that Salvino's responses to nearly all of MLBP's Rule 56.1 assertions were accompanied by the statement that the fact asserted was "not material," a characterization reflecting Salvino's contention that the challenged practice should not be the

subject of rule-of-reason analysis. Because we conclude, for the reasons discussed in Part II.C. below, that the rule of reason provided the appropriate analytical framework, Salvino's materiality objection also lacks merit.

### 4. Genuineness of Dispute

While a district court, in considering a motion for summary judgment, is not to resolve factual issues, the court must determine whether a Rule 56.1 response does in actuality present a dispute that is genuine. An objection to the admissibility of a document is not the equivalent of a contention that the document's contents are untrue. Thus, as to the "undisputed" MLBP assertions to which Salvino made objections, which as noted in the previous section were properly rejected, Salvino's responses were clearly insufficient to show a genuine issue to be tried as to the matters described in the documents.

In addition, the district court found that Salvino's responses to several other MLBP assertions, although commencing with the word "disputed," did not evince a dispute that was genuine. Those responses often were followed by statements that in effect admitted all or most of the MLBP assertion. For example, MLBP asserted that

> [i]n the late 1970's, MLBP began the process of clearing the rights to the MLB Club logos and other trademarks in various countries so that they could be licensed for use on retail products sold in those

countries.

(MLBP Rule 56.1 Statement ¶ 32.)  Salvino's response--in addition to objecting on grounds that the document cited by MLBP for that proposition was hearsay, speculative, and lacked foundation--was as follows:

> **DISPUTED** and not material.  While the cited declarations so state, even if the cited economies can be achieved by collectivizing certain activities, it does not justify an agreement by MLB teams to forego their own output and to divide profits rather than compete.  (<u>See</u> Guth Decl. ¶ 8-11.)

(Salvino Response to MLBP Rule 56.1 Statement ¶ 32.)  Similarly, as to MLBP's assertion that "[w]ithin a few years after 1986, MLBP caused the amount of revenues generated by MLB-licensed product to triple" (MLBP Rule 56.1 Statement ¶ 29), Salvino's response, in addition to making hearsay and foundation objections, stated:

> **DISPUTED** and not material.  Any increase was caused in large part by the logo licensing boom that was prevalent at the time, not by the pooling arrangement, and MLBP does not point to any evidence that increases came at the expense of competitive rivals in a relevant market.  <u>See</u> Guth Decl. ¶ 4.  Moreover, even if it is economical to streamline some functions, it does not justify an agreement by MLB teams to forego their own output and to divide profits rather than compete.  (<u>Id</u>. ¶¶ 8-11.)

(<u>See</u> Salvino Response to MLBP Rule 56.1 Statement ¶ 29.)

The district court considered these responses, as well as certain other similar responses relating to the substantial increase in the number of licenses granted for MLB Intellectual Property, not to present a factual dispute that was genuine.  The court stated that

Salvino does not dispute MLBP's stated increase in MLBP-licensed products since MLBP took over licensing authority for MLB intellectual property. (MLBP 56.1 Stmt. ¶¶ 26-36.) Salvino only takes issue with MLBP's proffered reasons for the increase, i.e., it claims the increase is a product of the "licensing boom" and not a result of MLBP's centralized process. (Salvino Resp. to MLBP 56.1 Stmt. ¶ 29.)

420 F.Supp.2d at 220-21. The district court's view that Salvino did not genuinely dispute the assertion that there was an increase in MLBP-licensed products after MLBP became the Clubs' exclusive licensing agent for MLB Intellectual Property to be used on all retail products was a reasonable interpretation of Salvino's responses. In any event, Salvino does not challenge that ruling in its briefs on appeal.

B.  Modes of Analysis Under the Sherman Act

By its terms, § 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. The Supreme "Court has not taken a literal approach to this language, however," but instead "has long recognized that Congress intended to outlaw only unreasonable restraints." Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006) ("Dagher") (internal quotation marks omitted) (emphasis in Dagher). Thus, "th[e] Court presumptively applies rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular

contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." Id.

There are, however, "certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 5 (1958); see, e.g., State Oil Co. v. Khan, 522 U.S. 3, 10 (1997) ("Some types of restraints . . . have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful per se."). Among the practices that have been held to be per se illegal are geographic division of markets, see, e.g., United States v. Topco Associates, Inc., 405 U.S. 596 (1972), and horizontal price fixing, see, e.g., Arizona v. Maricopa County Medical Society, 457 U.S. 332 (1982) ("Maricopa County Medical Society"); see also Leegin Creative Leather Products, Inc. v. PSKS, Inc., 127 S. Ct. 2705, 2717-18, 2725 (2007) (vertical agreements setting minimum resale prices are to be analyzed under the rule of reason), overruling Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373 (1911). Such "[p]er se treatment is appropriate '[o]nce experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it.'" State Oil Co., 522 U.S. at 10 (quoting Maricopa County Medical Society, 457 U.S. at 344).

Per se treatment is not appropriate, however, where the economic and competitive effects of the challenged practice are unclear.  "To justify a per se prohibition a restraint must have manifestly anticompetitive effects, . . . and lack . . . any redeeming virtue . . . ."  Leegin Creative Leather Products, Inc., 127 S. Ct. at 2713 (internal quotation marks omitted).  Accordingly, the Supreme Court has repeatedly "'expressed reluctance to adopt per se rules . . . "where the economic impact of certain practices is not immediately obvious."'"  Dagher, 547 U.S. at 5 (quoting State Oil Co., 522 U.S. at 10 (quoting FTC v. Indiana Federation of Dentists, 476 U.S. 447, 458-59 (1986) ("Indiana Federation of Dentists"))).  "[A] departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing."  Leegin Creative Leather Products, Inc., 127 S. Ct. at 2713 (internal quotation marks omitted) (emphasis added).  Thus, "[p]er se liability is reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'"  Dagher, 547 U.S. at 5 (quoting National Society of Professional Engineers v. United States, 435 U.S. 679, 692 (1978)); see, e.g., Broadcast Music, 441 U.S. at 9 ("[i]t is only after considerable experience with certain business relationships that courts classify them as per se violations" (internal quotation marks omitted)).

> [C]ombinations[] such as . . . joint ventures . . .
> hold the promise of increasing a firm's efficiency
> and enabling it to compete more effectively.

- 53 -

Accordingly, such combinations are judged under a rule of reason, an inquiry into market power and market structure designed to assess the combination's actual effect.

Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768 (1984).

Under rule-of-reason analysis, as described originally in Chicago Board of Trade v. United States, 246 U.S. 231 (1918), and reiterated by the Supreme Court many times since, see, e.g., Maricopa County Medical Society, 457 U.S. at 343 n.13,

[t]he true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

Chicago Board of Trade, 246 U.S. at 238. Thus, "[a]s its name suggests, the rule of reason requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition," Maricopa County Medical Society, 457 U.S. at 343, i.e., "whether the challenged agreement is one that promotes competition or one that suppresses competition," National Society of Professional Engineers,

435 U.S. at 691; see, e.g., Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49 (1977) ("Under this rule, the factfinder weighs all of the circumstances of a case . . . .").

> Under the rule of reason, the plaintiffs bear an initial burden to demonstrate the defendants' challenged behavior had an actual adverse effect on competition as a whole in the relevant market. . . . Because the antitrust laws protect competition as a whole, evidence that plaintiffs have been harmed as individual competitors will not suffice. . . . If the plaintiffs satisfy their initial burden, the burden shifts to the defendants to offer evidence of the pro-competitive effects of their agreement. . . . Assuming defendants can provide such proof, the burden shifts back to the plaintiffs to prove that any legitimate competitive benefits offered by defendants could have been achieved through less restrictive means. . . . Ultimately, the factfinder must engage in a careful weighing of the competitive effects of the agreement--both pro and con--to determine if the effects of the challenged restraint tend to promote or destroy competition.

Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc., 386 F.3d 485, 506-07 (2d Cir. 2004) (internal quotation marks omitted) (emphasis in original).

In a few cases, the Supreme Court has ruled that the challenged practice should neither be held a per se violation of the Sherman Act nor be subjected to full-blown rule-of-reason analysis, but rather should be held illegal on the basis of an "abbreviated or 'quick-look' [rule-of-reason] analysis" because "the great likelihood of anticompetitive effects can easily be ascertained." California Dental Ass'n v. FTC, 526 U.S. 756, 770 (1999) ("California Dental"). Thus, in National Society of Professional

*Engineers*, the Court, faced with the society's absolute ban on competitive bidding, ruled that "no elaborate industry analysis [wa]s required to demonstrate the anticompetitive character of such an agreement." 435 U.S. at 692. The Court reached the same conclusion with respect to a plan that expressly limited the number of college football games that could be televised and fixed a minimum price for those games, see National Collegiate Athletic Ass'n v. Board of Regents of the University of Oklahoma, 468 U.S. 85, 109-10 (1984) ("NCAA"), and with respect to a horizontal agreement among dentists to "withhold from their customers a particular service that they desire[d]," Indiana Federation of Dentists, 476 U.S. at 459. The California Dental Court noted that

> [i]n each of these cases, which have formed the basis for what has come to be called abbreviated or "quick-look" analysis under the rule of reason, an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.

California Dental, 526 U.S. at 770.

The Court has applied quick-look analysis only "to business activities that are so plainly anticompetitive that courts need undertake only a cursory examination before imposing antitrust liability." Dagher, 547 U.S. at 7 n.3. The fact that a practice may have a tangential relationship to the price of the commodity in question does not mean that a court should dispense with a full rule-of-reason analysis. In California Dental itself, the Court considered an association rule that required member dentists to make

- 56 -

certain disclosures in any advertising of discount prices, and it found that quick-look analysis was inappropriate. While accepting the propositions "that price advertising is fundamental to price competition" and that "[r]estrictions on the ability to advertise prices normally make it more difficult for consumers to find a lower price and for dentists to compete on the basis of price," 526 U.S. at 773 (internal quotation marks omitted), the Court found that "any anticompetitive effects of [these] restraints are far from intuitively obvious," and, therefore, "the rule of reason demands a more thorough enquiry into the consequences of those restraints," id. at 759. If an arrangement "might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition," more than a "quick look" is required. Id. at 771.

C.   The Record in the Present Case

In the present case, the district court, as described in Part I.C. above, viewed the centralization in MLBP of MLB Intellectual Property licensing as similar to the practice of blanket licensing the rights to perform copyrighted music, which the Supreme Court in Broadcast Music ruled was not per se unlawful but was to be subjected to rule-of-reason analysis. Salvino contends that the district court should instead have used NCAA as its analytical guide (see Salvino brief on appeal at 19-28), arguing that "[t]he conduct at issue here [constitutes] naked horizontal price and output restrictions [that] traditionally fall[] within the

- 57 -

per se proscriptions" (id. at 20).

We reject all of Salvino's contentions.  We discuss the comparisons with Broadcast Music and NCAA in sections 3 and 4 below, but we begin by examining the nature of Salvino's contentions as to "output" and "price."

#### 1.  Salvino's "naked output . . . restrictions" Contention

By "output," Salvino refers to licenses for the use of the MLB Clubs' intellectual property.  (See, e.g., Salvino Response to MLBP Rule 56.1 Statement ¶ 46 (in making MLBP their exclusive licensor, the Clubs "forego their own output"); id. ¶¶ 27-43, 47-50, 52-53 (same).)  But while Salvino calls the Clubs' exclusivity agreement a "naked output . . . restriction[]" (Salvino brief on appeal at 6)--asserting that there is an "express agreement to reduce output" (id. at 12 (emphasis added)) and that the agreement "restricts output by its terms" (id. at 11 (emphasis added))--and repeatedly characterizes the Clubs' agreement as one to reduce the number of licenses (see, e.g., id. at 6, 8-9, 20, 28), Salvino has pointed to no evidence to support its characterizations.  It has not cited to any term of the Agency Agreement or to any other agreement. Nor is a reduction in output implicit in the Agency Agreement.  The Clubs' agreement to make MLBP their exclusive licensor does not by its express terms restrict or necessarily reduce the number of licenses to be issued; it merely alters the identity of the licenses' issuer.

There is an assertion that Salvino itself was denied an MLBP license in 1999. (See Salvino Response to MLBP Rule 56.1 Statement ¶ 127.) But even assuming that Salvino completed the application for that license (a matter as to which there is dispute), a mere refusal to grant a license to Salvino would not suffice to support a claim of antitrust violation. "The antitrust laws were enacted for 'the protection of competition, not competitors.'" Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 338 (1990) (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962) (emphases in Brown Shoe)); see, e.g., Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977).

Moreover, as set out in Part I.B.2. above, the record in this case does not show any reduction in the licensing of the Clubs' intellectual property; rather MLBP presented evidence that there were sizeable increases. According to this evidence, when MLBP became the Clubs' exclusive licensor in 1987, there were approximately 100 licensees; in the first year thereafter, the number of licensees more than doubled. And in the years since, the number has continued to grow, with MLBP having, at the time of its summary judgment motion in this case, more than 300 licenses outstanding for some 4,000 products in the United States, along with licenses to some 170 licensees for sales of products outside of the United States. As discussed in Part II.A.4. above, the district court permissibly found that, while Salvino took issue with the reasons for the increase in the number of licenses for MLB

Intellectual Property, Salvino did not genuinely dispute that these increases had actually occurred.

Further, Salvino's disputation as to the reason for the increases in MLB Intellectual Property licenses--it posits that there was simply a boom in consumer demand--is unsupported. The only citation offered by Salvino for its contention was paragraph 4 of the Guth Declaration. That paragraph, however, did not state that an increase in demand was the cause of MLBP's increased revenues, or indeed that there was in fact an increase in demand. Rather, Guth stated that MLBP's "evidence of substantial increases in output of number of license arrangements and in MLBP revenues over a period of years . . . . would appear to be more consistent with a general increase in consumer interest in licensed retail merchandise of all sorts." (Guth Decl. ¶ 4 (emphasis added).) This statement is vague and conclusory. And even if "more consistent with" an increase in consumer interest is interpreted as "more likely caused by" such an increase in demand, Salvino failed to adduce any evidence to support such a hypothesis as to causation. Indeed, Guth also suggested, alternatively, that MLBP's increase in revenues "may well not reflect higher demand," but may instead reflect higher prices resulting from "an overall shift out in demand for such merchandise" (id. (first emphasis in original; second emphasis ours)). Guth's Declaration was necessarily equivocal because he had not performed any analyses or empirical studies (see, e.g., Guth Dep. at 23-24, 34-36, 46, 50, 137-38). Guth stated in

- 60 -

his deposition that he thought it would be "appropriate" to conduct an empirical study of "the possible extent of economic benefits" of the MLBP arrangement (id. at 23) and that "empirical analysis of the relevan[t] market would at some point be a crucial element in reaching economic opinions about the ultimate cost and benefits of the arrangements at issue in this proceeding" (id. at 24). But because no such studies or analyses were ever performed, Guth's opinions were not supported by evidence and were conjectural. Conclusory statements, conjecture, and speculation are insufficient to create a genuine factual dispute. See, e.g., Bridgeway Corp. v. Citibank, 201 F.3d at 142.

In sum, Salvino has pointed to no evidence in the record to support its contention that there has been a horizontal agreement to limit "output," and the only evidence of record--which Salvino has not genuinely disputed--is that output has greatly increased. We turn now to Salvino's contention that there has been a horizontal agreement on "price."

2. The Nature of the "Price" Agreement Challenged By Salvino

While Salvino contends that its challenge concerns "naked . . . price restrictions" (Salvino brief on appeal at 6; see, e.g., id. at 8-9, 20, 28), it is important to focus on precisely what conduct Salvino characterizes as "price" restrictions. Although price usually refers to the amount of money a seller charges a buyer for the product, Salvino has made no assertions that there is an

agreement as to the fees that the licensees of the MLB Intellectual Property are required to pay MLBP. Instead, throughout this litigation, the conduct that Salvino has contended is per se illegal price fixing is the Clubs' agreement to share equally in the profits from MLBP's licensing of the Clubs' intellectual property.

Thus, Salvino's complaint in the California action, which became its counterclaims in the present action, alleged that the Agency Agreement "reduced and suppressed price competition"

> [b]ecause [MLBP] distributes the income from its exploitation of trademarks equally to each member club--even though a relatively small number of clubs generate the bulk of the revenue . . . .

(Salvino's California action complaint ¶ 13 (emphasis added).) Similarly, Salvino's responses to MLBP's Rule 56.1 Statement contended that most of MLBP's factual assertions (as to, e.g., MLBP's operations, competition in the market for licensing of intellectual property, and the need for Major League Baseball to have a centralized licensing agent) were "not material" because the Clubs had entered into an agreement for the equal "sharing [of] all revenues." (Salvino Responses to MLBP Rule 56.1 Statement ¶¶ 55, 64, 65, 70-81, 87-91; see also id. ¶¶ 27-43, 50, 52, 53 ("an agreement . . . to divide profits"); id. ¶¶ 20-22 (an agreement "for an equal fixed share of revenues generated").)

And in this Court, Salvino's briefs likewise challenge the Clubs' agreement to receive the proceeds of MLBP's licensing in equal shares:

[T]he Agency Agreement among the MLB teams and MLBP[] is a horizontal agreement to restrict output of MLB teams and fix the compensation they receive. . . . Presumptively, this raises the issue of per se liability, for "[h]orizontal agreements among competing sellers to fix prices or restrict output are, absent more, per se violations of Section 1 of the Sherman Act."

(Salvino reply brief on appeal at 6 (quoting Freedom Holdings Inc. v. Spitzer, 357 F.3d 205, 225 (2d Cir. 2004)) (emphasis ours); see also Salvino brief on appeal at 25 ("MLBP, like the NCAA . . . . 'has fixed the minimum, maximum and actual price which will be paid to [its member teams]'" (quoting NCAA, 468 U.S. at 106 n.30) (brackets in Salvino brief)); Salvino brief on appeal at 25-26 (the Clubs have agreed to make MLBP their exclusive licensor "in exchange for a uniform fixed price--an equal share of the revenues generated by MLBP, regardless of contribution" (emphasis added)).)

Thus, it is clear that what Salvino means by "a uniform fixed price" is in actuality "an equal share of the [licensing] revenues" (id.). As there is no claim by Salvino of an agreement with respect to the prices to be charged to licensees, the so-called "price" restriction is not in fact an agreement on "price" but rather an agreement for the sharing of profits.

With the recognition that what Salvino calls a "price" restriction is in actuality an agreement for profit sharing, and bearing in mind that, as discussed in the preceding section, there is no genuine dispute that "output" since MLBP became the Clubs' exclusive licensing agent with respect to all retail products

bearing Club intellectual property has increased rather than decreased, we turn to Salvino's contention that the district court erred in finding this case similar to Broadcast Music, instead of finding the present arrangement per se illegal, or illegal after a quick look, based on NCAA.

3. The Broadcast Music Comparison

In Broadcast Music, the Supreme Court considered antitrust claims by Columbia Broadcasting System, Inc. ("CBS"), against Broadcast Music, Inc., and the American Society of Composers, Authors and Publishers (collectively the "organizations"), with respect to the organizations' respective issuance of blanket performance licenses to the CBS television network, i.e., licenses to perform any, some, or all of the copyrighted musical compositions owned by that organization's members or affiliates. CBS asserted that the issuance of blanket licenses in exchange for fees negotiated by the respective organizations was price fixing, and hence per se illegal. The district court, following a trial on issues of liability, ruled that blanket licensing did not fall within the per se rule; the court of appeals reversed, holding that blanket licensing was a form of price fixing and thus was per se illegal. The Supreme Court reversed the court of appeals, holding that blanket licensing is not per se illegal, but rather "should be subjected to a more discriminating examination under the rule of reason," 441 U.S. at 24, because it cannot be said that "the

practice facially appears to be one that would always or almost always tend to restrict competition and decrease output," rather than "one designed to increase economic efficiency and render markets more, rather than less, competitive," id. at 19-20 (internal quotation marks omitted). The Supreme Court stated:

> The blanket license, as we see it, is not a "naked restrain[t] of trade with no purpose except stifling of competition," . . . but rather accompanies the integration of sales, monitoring, and enforcement against unauthorized copyright use. . . . [The organizations] and the blanket license developed together out of the practical situation in the marketplace: thousands of users, thousands of copyright owners, and millions of compositions. Most users want unplanned, rapid, and indemnified access to any and all of the repertory of compositions, and the owners want a reliable method of collecting for the use of their copyrights. Individual sales transactions in this industry are quite expensive, as would be individual monitoring and enforcement, especially in light of the resources of single composers. Indeed, as both the Court of Appeals and CBS recognize, the costs are prohibitive for licenses with individual radio stations, nightclubs, and restaurants, . . . and it was in that milieu that the blanket license arose.

> A middleman with a blanket license was an obvious necessity if the thousands of individual negotiations, a virtual impossibility, were to be avoided. Also, individual fees for the use of individual compositions would presuppose an intricate schedule of fees and uses, as well as a difficult and expensive reporting problem for the user and policing task for the copyright owner.

441 U.S. at 20 (quoting White Motor Co. v. United States, 372 U.S. 253, 263 (1963)).

Although individual copyright owners remained free to grant direct licenses for the performance of their works, the

organizations

> reduce[d] costs absolutely by creating a blanket license that is sold only a few, instead of thousands, of times, and that obviates the need for closely monitoring the networks to see that they do not use more than they pay for. [The organizations] also provide[d] the necessary resources for blanket sales and enforcement, resources unavailable to the vast majority of composers and publishing houses.

441 U.S. at 21 (footnotes omitted). The Court stated that

> [t]his substantial lowering of costs, which is of course potentially beneficial to both sellers and buyers, differentiates the blanket license from individual use licenses. The blanket license is composed of the individual compositions plus the aggregating service. Here, the whole is truly greater than the sum of its parts; it is, to some extent, a different product.

Id. at 21-22. The Court concluded,

> we have some doubt--enough to counsel against application of the per se rule--about the extent to which this practice threatens the "central nervous system of the economy," . . . that is, competitive pricing as the free market's means of allocating resources. Not all arrangements among actual or potential competitors that have an impact on price are per se violations of the Sherman Act or even unreasonable restraints. Mergers among competitors eliminate competition, including price competition, but they are not per se illegal, and many of them withstand attack under any existing antitrust standard. Joint ventures and other cooperative arrangements are also not usually unlawful, at least not as price-fixing schemes, where the agreement on price is necessary to market the product at all.

Id. at 23 (quoting United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 226 n.59 (1940)) (emphases added).

Salvino seeks to distinguish Broadcast Music on the basis that (1) the individual copyright owners granted the organizations

only nonexclusive rights to license the performance of their works and remained free to grant performing rights licenses directly to users; (2) the blanket license granted by the organizations was a package product that no individual copyright owner could offer; and (3) in Broadcast Music, "[i]t was found that the arrangement actually increased output and facilitated competition" (Salvino brief on appeal at 18). Only the first of these factors provides a distinction, but it is a distinction that loses significance in the context of the differences between the music and sports industries.

Taking the three factors in reverse order, we note first that Salvino's statement that the Broadcast Music Court found that blanket licensing "increased output and facilitated competition" finds little support in the Supreme Court's opinion. If by "increased output," Salvino means that there were in fact more music performance licenses, the opinion squarely contradicts Salvino's statement. Although "there [we]re no practical impediments preventing direct dealing by the television networks if they so desire[d, h]istorically they ha[d] not done so." Broadcast Music, 441 U.S. at 12. Indeed, until the Broadcast Music lawsuit, CBS had never sought any kind of performance license other than blanket licenses from the organizations. Accordingly, there was no "increased output" in the sense of the number of licenses granted. The Court itself used the term "output" in the music industry to refer to the creation of musical compositions and merely noted that blanket licensing was unlikely to cause composers to cease producing

compositions. See id. at 22 n.40.

Further, in the present case, as discussed in Part II.C.1. above, there has been no evidence of any reduction in output. Instead, since MLBP became the Clubs' exclusive licensing agent for all retail products bearing Club intellectual property, the number of licenses granted has multiplied.

Nor do we see either (a) support for Salvino's suggestion that the Broadcast Music Court held blanket licensing to have "facilitated competition" (Salvino brief on appeal at 18) or (b) a meaningful distinction between Broadcast Music and the present case with respect to what in fact was "facilitated." The availability of blanket licenses had not led to direct licensing by individual copyright owners; indeed, the Broadcast Music Court stated that to the extent that the blanket license is a different product, the organizations had created "a market in which individual composers are inherently unable to compete fully effectively," 441 U.S. at 23. What the blanket license was held to have facilitated was "dealings between copyright owners and those who desire[d] to use their music," id. at 10--much in the same way that MLBP's licensing activities facilitate the use of the Clubs' intellectual property by those who desire to use it on products they wish to market.

The second distinction urged by Salvino is the fact that the blanket license at issue in Broadcast Music was a product that no single copyright owner could offer. But this fact reveals not a difference but a similarity. MLBP can offer a license that covers

all of the intellectual property of all of the MLB Clubs; no one Club could offer such a license, for no Club has the right to license the intellectual property of any other. Accordingly, even if direct licensing for retail products were available from each Club, any purveyor of memorabilia who wanted to offer products bearing the intellectual property of more than one Club could not obtain the necessary authorization from a single Club. Only MLBP can offer licenses to use the intellectual property of more than one Club, and it can grant a license to use any, some, or all of the Clubs' intellectual property. Accordingly, MLBP offers a large number of products that the individual intellectual property owners cannot match.

Finally, as discussed in Part I.B.2. above, the Clubs retain only limited rights to grant licenses directly, e.g., with respect to product giveaways in their home stadia and activities such as cruises and fantasy camps; they have given up the right to license products using their intellectual property for retail sales, making MLBP their exclusive licensing agent with respect to those products. Thus, it is true, as Salvino argues, that the rights of the individual MLB Clubs to license their own respective intellectual property are more limited than the unfettered direct licensing rights of the copyright owners in Broadcast Music. We conclude that this distinction is insignificant, however, in light of the fact that the MLB Clubs exist as members of a sports league, and their interests are interdependent. That interdependence and

- 69 -

Major League Baseball's need for competitive balance among the Clubs distinguish the Clubs from the individual composers and publishers of music who were the subject of Broadcast Music; those factors are not characteristic of the music industry. And those factors, among others, discussed in Part II.C.5. below, plainly foreclose the imposition of per se or quick-look liability.

### 4. The NCAA Comparison

Salvino contends that "NCAA . . . is . . . the yardstick that should have been used by the court to evaluate the arrangement at issue" in the present case. (Salvino brief on appeal at 19.) We disagree, as we find the circumstances in NCAA to be different from those here in every meaningful respect.

In NCAA, the Supreme Court considered rules of the National Collegiate Athletic Association ("NCAA") with respect to the televising of college football games. The NCAA had entered into contracts with American Broadcasting Companies ("ABC") and CBS, permitting those networks to broadcast such games, and had entered into a contract with Turner Broadcasting System, Inc. ("TBS"), for the cablecasting of such games. The NCAA did not license any other network, and the NCAA plan forbade its member colleges to enter into agreements for the televising of their games on any other network or any local station. See NCAA, 468 U.S. at 91-93, 105 n.29.

The NCAA plan set an absolute maximum on the number of games that could be broadcast. It also contained "appearance

limitations" with respect to each two-year period covered by the network contracts. The number of times that a given college could have its football games televised was limited to six, of which no more than four could be televised nationally. Thus, the NCAA plan limited both the total amount of televised intercollegiate football and the number of games that could be televised for any one team. See generally id. at 92-94.

The per-telecast prices paid by the networks to the NCAA were fixed. For example, the ABC television network paid fees of $600,000 for each of the 12 national games it telecast during the 1981 regular fall season, and $426,779 for each of the 46 regional telecasts in 1980. Id. at 93 n.10. Except for the price differences between national and regional telecasts, the colleges whose games were televised received equal payments for those telecasts.

The district court, after a full trial, found that the NCAA plan violated § 1 of the Sherman Act by, inter alia, fixing the prices for particular telecasts and placing artificial limits on the televising of college football. It found that but for the NCAA plan, more college football games would be televised. The court of appeals affirmed, ruling that the NCAA plan constituted price fixing and hence was per se illegal.

The Supreme Court affirmed, but it ruled that the plan should not have been held illegal per se; it should have been analyzed under the rule of reason. The Court stated that

- 71 -

> [t]here can be no doubt that the challenged practices of the NCAA constitute a "restraint of trade" in the sense that they limit members' freedom to negotiate and enter into their own television contracts. In that sense, however, every contract is a restraint of trade, and as we have repeatedly recognized, the Sherman Act was intended to prohibit only unreasonable restraints of trade.

NCAA, 468 U.S. at 98. Noting that Continental T.V., Inc., 433 U.S. at 51-57, indicated that "a restraint in a limited aspect of a market may actually enhance marketwide competition," and that "Broadcast Music squarely holds that a joint selling arrangement may be so efficient that it will increase sellers' aggregate output and thus be procompetitive," the NCAA Court stated that

> [t]hus, despite the fact that this case involves restraints on the ability of member institutions to compete in terms of price and output, a fair evaluation of their competitive character requires consideration of the NCAA's justifications for the restraints.

NCAA, 468 U.S. at 103.

Accordingly, the Supreme Court proceeded to analyze the NCAA plan under the rule of reason. In so doing, it concluded that the plan unreasonably restrained competition; however, few of the factors relied on by the Court to reach that conclusion are present with respect to Salvino's claim against MLBP.

The Supreme Court found that the NCAA plan was anticompetitive under rule-of-reason analysis because, inter alia, that plan deprived the individual colleges of their freedom to compete for television appearances. Rejecting the NCAA's contention that its plan produced procompetitive efficiencies (see Part

II.C.4.c. below), the Court noted that "[t]he NCAA does not . . . act as a selling agent for any school or for any conference of schools"; rather,

> [t]he essential contribution made by the NCAA's arrangement is to define the number of games that may be televised, to establish the price for each exposure, and to define the basic terms of each contract between the network and a home team.

Id. at 113; see id. at 99 (The NCAA plan "places a ceiling on the number of games member institutions may televise," thereby "plac[ing] an artificial limit on the quantity of televised football that is available to broadcasters and consumers."). As a consequence, the Court concluded, "[p]rice is higher and output lower than they would otherwise be, and both are unresponsive to consumer preference." Id. at 107.

Except for the fact of revenue sharing, none of the factors emphasized by the Supreme Court in NCAA finds even a superficial parallel in the present case.

### a. Agency and Output

Whereas the Supreme Court noted that the NCAA did not act as a selling agent for those whose product was being sold, precisely the opposite is true of MLBP. A college that wished to have more than six of its games televised within a two-year period was forbidden, rather than helped, to do so by the NCAA. MLBP, in contrast, is the licensing agent for the MLB Clubs; it assists the Clubs in the licensing of their intellectual property.

- 73 -

Further, whereas the NCAA plan "create[d] a limitation on output" by limiting the total number of televised games and the number of times any one college's games could be televised, NCAA, 468 U.S. at 99, Salvino has not adduced any evidence of a limitation on the number of Club intellectual property licenses available here. MLBP does not limit the number of products that may be licensed (although it would doubtless refuse to license a product that it believed would reflect badly on Major League Baseball); indeed, MLBP presented evidence that it works with existing and prospective licensees to attempt to develop new products that would use MLB Intellectual Property. Salvino has not adduced any evidence that there is any agreement to limit the number of products that can be licensed or the number of entities to which licenses may be granted.

Nor has Salvino pointed to any evidence from which it could reasonably be inferred that any limitation on the number of licenses, licensees, or products bearing MLB Intellectual Property is intended. Rather, as discussed in Parts I.B.2. and II.C.1. above, the business records presented by MLBP show precisely the opposite, the desire to increase the business of licensing MLB Intellectual Property.

The NCAA Court also noted that output was reduced by the NCAA plan because "only those broadcasters able to bid on television rights covering the entire NCAA can compete." NCAA, 468 U.S. at 108. In effect, the NCAA offered only bulk licenses. That fact has no analogy here. Here, a prospective licensee can request and

obtain from MLBP a license to use the intellectual property of some or all of the Clubs, or of any single Club.

b.   Prices and Preferences

In finding the NCAA's restrictive television plan anticompetitive because of its restraints on price, the Supreme Court stated that the

> NCAA has commandeered the rights of its members and sold those rights for a sum certain. In so doing, it has fixed the minimum, maximum and actual price which will be paid to the schools appearing on ABC, CBS and TBS. NCAA has created the mechanism which produces a uniform price for each national telecast, and a uniform price for each regional telecast. Because of the NCAA controls, the price which is paid for the right to televise any particular game is responsive neither to the relative quality of the teams playing the game nor to viewer preference.

NCAA, 468 U.S. at 106 n.30 (internal quotation marks omitted) (emphases added). The NCAA Court stated that the fact that, under the conditions imposed by the NCAA, "the market is not responsive to viewer preference," with the result that "[m]any games for which there is a large viewer demand are kept from the viewers, and many games for which there is little if any demand are nonetheless televised," was "[p]erhaps the most pernicious aspect" of the NCAA plan. Id. at 107 n.34 (internal quotation marks omitted).

The NCAA price controls and lack of responsiveness to demand find no parallels in the present record. First, a license to use MLB Intellectual Property is not sold "for a sum certain"; the licensing agreements call for licensees to pay MLBP a percentage of

the moneys they receive from the sale of their products bearing MLB Intellectual Property. Thus, although the royalty percentages for various types of products may be standardized, the dollar amounts to be paid to MLBP by the licensees are not uniform but instead vary with the licensees' sales.

Second, Salvino has presented no evidence to suggest that the licensing of MLB Intellectual Property is not entirely responsive to demand. MLBP does not issue licenses that are not requested; there is no evidence that an entity that wishes to obtain a license for particular intellectual property is required to accept or pay for a license that encompasses other intellectual property as well.

Moreover, it may be presumed that a prospective licensee, acting in its own economic self-interest, requests licenses only with respect to products that it believes will be purchased. Thus, MLBP grants licenses that are responsive to the licensees' anticipation of consumer demand.

Further, a licensee's actual sales of products bearing MLB Intellectual Property are, by definition, responsive to consumer demand. Assuming that the licensees assess consumer demand correctly, they will sell more products bearing logos of a Club that is more popular--more popular either because of its success on the playing field or because of a dedicated fan base--than products bearing logos of a less popular Club. Accordingly, because the license requires the licensee to pay a percentage of its sales

- 76 -

prices, the licensee will pay MLBP higher dollar amounts with respect to the intellectual property of the more popular Clubs. Thus, the dollar amounts of the license fees received by MLBP with respect to the intellectual property of the various Clubs are not uniform from Club to Club, but instead are plainly responsive both to the relative quality of the various Major League Baseball teams and to the preferences of the buyers. Indeed, the fact that MLBP receives proportionately higher revenues with respect to some Clubs than others is the cornerstone of what Salvino complains of as "price" restrictions, i.e., the Clubs' agreement to share the profits equally.

Finally, MLBP-licensed products that are not desired by the consumer are not purchased. And because the licenses granted by MLBP require payments of percentages of the licensee's sales, products left behind by the consumer do not result in payments to MLBP or to the Clubs.

In sum, unlike the "sum[s] certain" payable in NCAA, the dollar sums payable for licenses to use the Clubs' intellectual property are not uniform and are entirely responsive to the preferences of licensees and retail product consumers.

c. Procompetitive Efficiencies

The NCAA Court rejected the NCAA's contention that its restrictive television plan produced procompetitive efficiencies. The Court stated several reasons, none of which has been shown to

have any applicability here.

As a general matter, the Court found that the NCAA's procompetitive-efficiencies contention was not supported by the record because production was restricted, not enhanced, by the plan. "If the NCAA's television plan produced procompetitive efficiencies, the plan would increase output and reduce the price of televised games." NCAA, 468 U.S. at 114.

In the present case, as described in Parts I.B.2., II.C.1., and II.C.3. above, the record shows that, similarly to the blanket licensing at issue in Broadcast Music, centralization of the licensing and protection of MLB Intellectual Property has produced many cost-savings and efficiencies. And, in contrast to the effect of the NCAA plan, as discussed in Parts I.B.2. and II.C.1. above, since the Clubs made MLBP their exclusive licensing agent for all retail products bearing MLB Intellectual Property, the number of licenses and licensees has multiplied.

Moreover, unlike the record in NCAA, the present record contains no facts to support Salvino's hypothesis that if MLBP were not the Clubs' exclusive licensor with respect to retail products, even more licenses would be granted. When Salvino's economist, Guth, was asked at his deposition whether in his opinion there would be more licenses if the Clubs were allowed to license directly (see Guth Dep. at 136-37), he stated, "I can't give you a straight yes or no answer," because "that's a question that needs to be explored with some empirical analysis" (id. at 137). Guth, however, had

conducted no empirical analyses. (See id. at 137-38.)

The NCAA Court also rejected, for two reasons, the NCAA's procompetitive-efficiencies contention that rested on the proposition that the NCAA had a legitimate and important interest in "maintaining a competitive balance among amateur athletic teams." NCAA, 468 U.S. at 117. First, the Court noted that there was no real interdependence among the college teams, nor indeed "any readily identifiable group of competitors," id. at 118, such as to require steps to maintain a competitive balance.

> The NCAA does not claim that its television plan has equalized or is intended to equalize competition within any one league. The plan is nationwide in scope and there is no single league or tournament in which all college football teams compete.

Id. at 117-18 (footnote omitted). Second, the Court noted that even if the NCAA had an interest in maintaining competitive balance among the college football teams, "[t]he television plan is not even arguably tailored to serve such an interest," id. at 119, given that but for the NCAA plan, more college football games would be televised, see id. at 108, 118 n.62. The Court stated that

> [t]he hypothesis that legitimates the maintenance of competitive balance as a procompetitive justification under the Rule of Reason is that equal competition will maximize consumer demand for the product. The finding that consumption will materially increase if the controls are removed is a compelling demonstration that they do not in fact serve any such legitimate purpose.

Id. at 119-20 (footnote omitted).

In the present case, in contrast, Major League Baseball is

a highly integrated professional sports entity comprising two Leagues, in which all of the Clubs compete. Each season constitutes a single tournament, leading to playoffs among the League leaders, and ultimately to the World Series. As discussed in Part II.C.5. below, there is no dispute that competitive balance is a necessary ingredient in the continuing popularity of the MLB Entertainment Product. And unlike the NCAA restrictions on televising games, which were "not even arguably tailored to serve" an interest in competitive balance, 468 U.S. at 119, the Clubs' agreement that MLBP's profits from licensing MLB Intellectual Property will be distributed equally among the 30 Clubs is a precisely tailored attempt to achieve, or at least increase, competitive balance.

Finally, the NCAA contended that its television plan was procompetitive because it was necessary to permit college football games to compete in the market for sports programming, a market in which the NCAA claimed to lack power. The Supreme Court rejected this contention as well. See NCAA, 468 U.S. at 111-15. The Court stated that "[i]f the NCAA faced 'interbrand' competition from available substitutes, then certain forms of collective action might be appropriate in order to enhance its ability to compete," id. at 115 n.55; but college football is "unique," id. at 115. The Court found it "evident" that the NCAA in fact "does possess market power" because intercollegiate college football telecasts are uniquely attractive to fans, "football telecasts generate an audience uniquely attractive to advertisers[,] and . . . competitors are

unable to offer programming that can attract a similar audience." Id. at 111. Because college football telecasts are unique, they constitute "a separate market"; and it follows "inexorably . . . that the NCAA possesses market power with respect to those broadcasts. 'When a product is controlled by one interest, without substitutes available in the market, there is monopoly power.'" Id. at 112 (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 394 (1956)).

In the present case, the only evidence of record shows that product uniqueness is absent. Although Salvino suggests that "the bundle of . . . rights licensed by MLBP is . . . highly differentiated from other bundles with which MLBP apparently believes it competes" (Guth Decl. ¶ 6; see Salvino brief on appeal at 12 n.5 (contending that Guth Decl. ¶¶ 5-6 "define[s] a relevant market")), no factual support was offered for the suggestion that there are no available substitutes for MLB Intellectual Property because Guth had not conducted any factual studies (see, e.g., Guth Dep. at 23-24). Thus, after Guth, in his deposition, reiterated an opinion given in his initial Report that "'MLBP quite likely exercises sufficient control over pricing licenses for use of club marks for plush toys and similar products so that these constitute a relevant market'" (id. at 33 (quoting Guth Report ¶ 23)), the ensuing questioning revealed that that opinion was based not on factual evidence but on "guess[es]":

Q. So that's a market for club marks or market

for plush toys and similar products?

A. It's a market for club marks used in conjunction with plush toys and similar products.

Q. Do you have any understanding of what Team Beans is?

A. Not specifically. My recollection is Major League Baseball had or has licenses for one, maybe several entities for similar kind[s] of plush toys.

Q. What is your understanding as to whether or not Team Beans product is within or outside the relevant market [in] your opinion?

A. Sitting here today, I would think it's probably within the relevant market.

Q. Why?

A. It's my guess that those products defined in the framework of the discrete choice survey would likely show up as having price sensitivity vis-a-vis the Salvino products. I don't know that, but that's, you know, sitting here today, that would be my guess.

Q. Are you aware that Salvino made some Bammers that did not have a club mark, but had a player name and number only on it?

A. That's my recollection, yes.

Q. Do you consider those products to be inside or outside of the relevant product market?

A. Again, that's an empirical question. Sitting here today, I'd be[] less confident opining one way or the other, but it's entirely possible that they could be in the relevant part [sic; market?].

Q. Are you familiar with Salvino Bammers that carried NFL team logos?

A. Not specifically.

Q. Let's assume for the moment that Salvino

made some Bammers.

A. Sure.

Q. The same size plush bear that carried a NFL team logo, New York Giants. For example, would you consider those to be in or outside the relevant market?

A. I think that that's what a[n] empirical analysis really let[s] you focus on. I mean, that's where you're getting to the meaningful empirical questions, in my opinion. Whether you know baseball, given its seasonality and given its--the way in which its products are made available to public competes with club marks license for a similar product or indeed other products that are sports or non-sports and made in different seasons or the same season. Those are the issues that an empirical analysis ought to address.

Q. Sitting here today, do you have any opinion as to whether Bammers with NFL marks would be within or outside the market?

A. No. Frankly, I really don't. I mean, you're asking me whether an increase in the price on, you know, an NFL Bammer would lead people to buy a Major League Baseball Bammer instead of the NFL Bammer, and just listening to those words, I'm not sure I see a basis for concluding that it would, but I'm going to leave that to an empirical analysis.

Q. But you haven't undertaken that empirical analysis yet either?

A. That's correct.

(Guth Dep. at 33-36 (emphases added); see also id. at 60 (Guth stating that to identify the relevant market, empirical studies would be needed not only with respect to the NFL, but also with respect to the "NHL, NBA, Major Soccer League, et cetera," as well as popular cartoon items).) (We think Guth's views could also benefit from an empirical study that included regard for fan

preferences. He indicated that "[f]or purposes of [his deposition] testimony without having done empirical analysis," he supposed that a consumer who is unable to purchase an MLBP New York Yankee Bammer would eschew an NFL Jets Bammer and would substitute instead an MLBP Bammer representing the Boston Red Sox. (Id. at 50, 58.).)

While Guth had not conducted the empirical studies that he testified were needed before he could do more than make guesses as to what might be substitutable for MLB Intellectual Property licenses, there was ample evidence in the record that prospective licensees of MLB Intellectual Property displayed interest in using intellectual property of, inter alia, other sports entities and leagues. For example, as set out in Part I.B.2. above, representatives of Coca-Cola told the MLBP executive committee in 1966 that, a few years earlier, Coca-Cola had chosen to use NFL intellectual property for a nationwide promotional campaign, rather than MLB Intellectual Property, because of ease of licensing. Further, as set out in greater detail in Part I.B.3. above, when Salvino sought an MLBP license in 1999, Salvino stated that it had sold Bammers bearing the intellectual property of the MLB Players' Association, the NFL, the NBA, the NHL, "Muhammad Ali," and other individuals. Indeed, a Salvino brochure declared that Bammers were "'America's Number 1 Sports Collectible'" in baseball, football, boxing, basketball, ice skating, hockey, and NASCAR. (See Salvino Response to MLBP Rule 56.1 Statement ¶ 120.) In addition, Salvino's vice president testified, inter alia, that Salvino competed with

"'anybody who produces sports licensed products; anybody who produces, you know, signed products, collectibles, memorabilia; anybody who produces licensed key chains, zipper pulls, non-licensed key chains, zipper pulls.'" (Salvino Response to MLBP Rule 56.1 Statement ¶ 116.)

Plainly, then, the only evidence presented to the district court indicates that, unlike the NCAA's unique product, college football, there are available substitutes for MLB Intellectual Property. Based in part on the above facts, Fisher opined that MLBP lacked power in the relevant market, which he defined as no narrower than the market for the licensing of intellectual property related to sports and certain entertainment products.

Finally, there seems to be no genuine dispute that the market level that is at issue in this case is the licensing level, with demand at that level being influenced by demand at the consumer level (see, e.g., Fisher Report ¶ 18; Guth Report ¶ 23), and that other professional sports entities have centralized licensing operations, e.g., NFL Properties, NBA Properties, and NHL Enterprises (see Part I.A.3. above). Although Salvino purported to contest the assertion that MLBP competes with these other entities, Salvino's challenge does not present a genuine dispute, given the evidence (a) that Salvino has not disputed that the standard license issued by each of these other sports entities states that the entity has the exclusive right to license the names, initials, emblems, uniforms, and other intellectual property of each team within that

professional sports league; (b) that Salvino obtained licenses for its Bammers using intellectual property of baseball, football, boxing, basketball, ice skating, hockey, and NASCAR; (c) that Salvino itself stated that being able to deal with NFL Properties provided the advantage of "one-stop shop[ping]"; and (d) that MLBP was informed by the Coca-Cola representatives that the NFL had a competitive advantage over MLB in the mid-1960s because the NFL had a centralized licensing entity and MLB did not.

Further, when Guth was asked whether the fact that such sports leagues as the NFL, NBA, and NHL use centralized licensing entities would affect his analysis as to whether or not MLB needed a centralized licensing organization, Guth stated that although he did not think it would, he "wouldn't dismiss [that factor] out of hand." (Guth Dep. at 115.) We consider this a telling response in the face of Salvino's contention that centralization of licensing in MLBP should be declared illegal per se or on a quick look--treatment that is inappropriate unless the anticompetitive nature of the practice is intuitively obvious.

d. Revenue Sharing

The only aspect of the Supreme Court's criticisms of the NCAA plan that is even superficially similar to the present case is the Court's observation that the NCAA plan was

> "a price restraint that tends to provide the same
> economic rewards to all practitioners regardless of
> their skill, their experience, their training, or

their willingness to employ innovative and difficult procedures."

NCAA, 468 U.S. at 107 n.33 (quoting Maricopa County Medical Society, 457 U.S. at 348). However, the circumstances of both NCAA and Maricopa County Medical Society differ significantly from those here.

In Maricopa County Medical Society, the Court was concerned with a plan that involved the fixing of maximum prices that physicians could charge for health services to policyholders under specified insurance plans. The physicians were "independent competing entrepreneurs." 457 U.S. at 357. In the present case, in contrast, the Clubs are professional baseball teams that are interdependent members of the Major Leagues. Further, as discussed in Part II.C.5. below, the need for competitive balance among the Clubs is essential to the well-being of the Leagues.

NCAA, which, like the present case, involved sports teams, is significantly different from the present case because it involved a sport at the college level. Colleges exist primarily to provide an education for their students; indeed, some colleges have no football program at all. In contrast, the present case involves a sport at the professional level. Providing baseball entertainment in their respective Leagues is the Clubs' raison d'être; if a Club cannot compete sufficiently to attract fans, it ceases to exist (i.e., moves to another geographic location and becomes a different Club). The professional baseball entertainment product is enhanced

and protected by fostering competitive balance among the Clubs. Colleges with sports teams that are competitively weak nonetheless continue to exist and pursue their primary goal, education.

In sum, unlike Maricopa County Medical Society and NCAA, this case involves an integrated professional sports league in which the competitors are not independent but interdependent, competitive balance among the teams is essential to both the viability of the Clubs and public interest in the sport, and profit sharing is a legitimate means--approved by both of the economists in this case, see Part II.C.5. below--of maintaining some measure of competitive balance.

### 5. Professional Sports Ventures

In the present case, the district court observed that antitrust challenges to the operations of sports leagues have generally been analyzed by the courts under the rule of reason, rather than being held illegal per se, because competition among the teams in their fields of play is to an extent dependent upon the teams' cooperation with each other in various other respects. Salvino contends that this was error, arguing that the licensing of intellectual property is only "collaterally related to professional sports" and that "[t]he conduct at issue here, naked horizontal price and output restrictions, traditionally falls within the per se proscriptions."  (Salvino brief on appeal at 20 (emphasis added).)

Given that the record shows only increases, not decreases, in output (see Parts I.B.2. and II.C.1. above), and that the so-called "price" restriction challenged by Salvino is simply the Clubs' equal sharing of MLB Intellectual Property licensing profits (see Part II.C.2. above), Salvino's contention that the district court erred in not applying per se or quick-look analysis is meritless.

As discussed in Part I.B.1. above, the MLB Entertainment Product comprises some 2,400 interrelated regular-season Major League Baseball games played each year, followed by playoff games for the American and National League championships, and culminating in the World Series. The production of this entertainment requires the joint efforts of the 30 Clubs; it cannot be produced by any one Club individually or even by a few Clubs. In creating the MLB Entertainment Product, the Clubs plainly do not operate separately or independently but rather are interdependent entities in an organization that is highly integrated.

It is undisputed that the production and value of the MLB Entertainment Product affect the value of MLB Intellectual Property. For example, when the Major League Baseball players were on strike in 1994 and 1995, sales of products bearing MLB Intellectual Property decreased; when the strike ended, sales of those products increased. Further, the value of the intellectual property of a particular Club is dependent in part on that Club's membership in MLB (for example, Fisher pointed to the decline in value of the intellectual property of such former Clubs as the Houston Colt 45s

and the St. Louis Browns), and in part on the Club's popularity. Although every Club no doubt has a core of die-hard fans, a Club's popularity is affected principally by its success on the baseball field and by how the play of each game relates to the season as a whole.

Moreover, it cannot be disputed that the performance aspect of a Club's popularity is related to the Clubs' interdependence. Obviously, a team cannot win games or championships unless it has opponents. Thus, even Clubs that fail to achieve winning records, and that have only small steadfast fan bases, contribute to the popularity of the more successful Clubs. Direct licensing by the Clubs, as recommended by Salvino and Guth, would result in the more popular Clubs granting more licenses and receiving more income for their intellectual property than the less popular Clubs would grant and receive. (See, e.g., Salvino brief on appeal at 30 ("If an organization is successful in . . . competition, then it should be entitled to reap the fruits of its acumen."); Guth Report ¶ 32 (describing "an alternative role for MLBP" in which Clubs' "ability to generate revenues from their licensing would be dependent on the value of their mark[s]").) This inequality in licensing income, however, would "over-compensat[e] the popular team for the joint efforts of all Clubs." (Fisher Report ¶ 81.)

Further, the disproportionate distribution of licensing income would foster a competitive imbalance among the Clubs. The

concept of "competitive balance"

> reflects the expected equality of opportunity to compete and prevail on the field. Competitive balance also relates to the fans' expectations that each team is a potential champion--i.e. that each Club has a reasonable opportunity to win each game and also to compete for a championship.

(Id. ¶ 14.)

There is no genuine dispute here that maintaining the value of the MLB Entertainment Product requires competitive balance among the Clubs. Fisher calls "competitive balance . . . critical to the success of MLB." (Id. ¶ 68.) And Salvino acknowledges that

> MLB teams, like all teams in sports leagues, need to cooperate in terms of scheduling, rulemaking, league format, competitive balance and both the live performance and televising of games, in order to create and market the product, which is baseball games.

(Salvino brief on appeal at 27 (emphases added); see also Salvino's California action complaint ¶ 14 (citing "on-field competitive balance" as a "legitimate or procompetitive goal").)

Accordingly, Fisher opined that "all the Clubs must be rewarded in order to ensure continued league-wide efforts as well as to foster competitive balance." (Fisher Report ¶ 68 (emphasis in original).) And while Salvino argues that MLBP's equal distribution of licensing income to the Clubs is illegal per se or upon quick-look analysis, it is telling that precisely such a distribution was ultimately approved by Salvino's own expert. In his initial Report, Guth stated that the goal of equalizing the Clubs' competitiveness could be achieved by "sharing ticket revenues and broadcast

revenues" and the imposition of "team salary cap rules." (Guth Report ¶ 10.) We find it difficult, as a logical matter, to fathom why the sharing of revenues from the licensing of intellectual property should be any less valid than the Guth-recommended sharing of revenues from other sources. And in fact, Guth himself ultimately suggested that the free-rider problems, which could occur if Clubs licensed directly, should be solved by "the revenue sharing aspect of the MLBP," i.e., the equal distributions of the licensing profits to the Clubs:

> [T]he solution to these problems as analyzed in the economics literature has to do with modifying the pay-offs to the Clubs individually so that their incentives are consistent with capturing prevailing externalities. . . . Thus, for example, MLBP currently sets pay-offs to the clubs based on a one-thirtieth proportionate share to each club. Moreover, Major League Baseball generally has a variety of tools available to it to deal with "too large a slice" of overall revenue going to one Club or another. These include sharing ticket revenues, national TV contract revenues, MLB intellectual property licensing, and excessive payroll adjustments. In this case, the revenue sharing aspect of the MLBP, or something similar, is likely sufficient to solve an externality problem, if such a problem actually exists.

(Guth Decl. ¶ 17 (footnote omitted) (emphases added).) Indeed, Guth's view is that equal distributions of profits--which is the only conduct that Salvino challenges as "price restrictions"--would in fact be procompetitive: "Revenue sharing in which teams' payoffs are based on the total figure would encourage teams to maximize total revenues in order to maximize their own, even if this would otherwise be inconsistent with their individual interests." (Guth

Decl. ¶ 17 (emphases added).)

In sum, given Salvino's own view that "MLB teams, like all teams in sports leagues, need to cooperate in terms of . . . competitive balance" (Salvino brief on appeal at 27), and Salvino's expert's view that "[r]evenue sharing . . . encourage[s] teams to maximize" output and revenues (Guth Decl. ¶ 17), it would defy reason for this Court to accept Salvino's contention that any anticompetitive aspects of the Clubs' agreement on the equal division of MLBP's licensing profit are at all apparent, much less so obvious that that agreement should have been held illegal per se or upon a quick look.

D. Rule of Reason

Finally, given the present record, we see no error in the district court's analysis of Salvino's claim under the rule of reason. The court noted that Salvino had proffered no evidence that the centralization of licensing in MLBP caused any actual injury to competition or any evidence that MLBP possessed power in the relevant market. The court stated that, "[i]ndeed, Salvino did not respond to MLBP's arguments regarding the rule of reason analysis and instead urged the Court to analyze its claims under the per se rule or quick look doctrine, neither of which would require Salvino to make a showing of adverse effect on the market." 420 F.Supp.2d at 220.

On this appeal, Salvino has again argued solely that the

court should have applied the per se or quick-look rule and has presented no basis for a ruling that, if rule-of-reason analysis was applicable, the district court erred in the conduct of that analysis. Our own examination persuades us that, on this record, the district court's analysis was correct. We express no view as to what the outcome would be of a case in which a plaintiff challenging the Clubs' centralization of licensing functions in MLBP as their exclusive licensing agent adduced admissible evidence as to the reasonableness of that practice.

CONCLUSION

We have considered all of Salvino's arguments on this appeal and have found them to be without merit. The judgment of the district court is affirmed.

SOTOMAYOR, *Circuit Judge*, concurring in the judgment:

I concur fully in the judgment. I write separately because I believe the majority endorses an overly formalistic view of price fixing and in so doing avoids addressing directly the central contention of appellant Salvino, Inc. ("Salvino") that the exclusive arrangement between the Major League Baseball clubs (the "Clubs") and Major League Baseball Properties, Inc. ("MLBP") removes all price competition between the Clubs on the licensing of intellectual property in violation of the Sherman Act, 15 U.S.C. § 1. Further, while I agree with the ultimate outcome of this appeal, I reach my conclusion using a different framework than the majority, applying the doctrine of ancillary restraints, which I believe more efficiently addresses the issues presented here.

Before applying this framework, however, I address the majority's flawed view that the Clubs have made no agreement on price.[1] It is undisputed that the Clubs have agreed through the exclusivity and profit-sharing clauses in the MLBP agreement not to compete with each other on the sale of trademark licenses. Instead, they have agreed to give MLBP the sole authority to set prices for all Major League Baseball licenses and to share equally in the proceeds from those licensing sales.[2] While the MLBP agreement does not specify a price to be charged, the effect of the agreement clearly

---

[1] It is unclear how much weight the majority places on the lack of any explicit price or output restrictions, *see* Maj. Op. at 55-61 (Parts II.C.1-2), or whether it ultimately relies on the distinctions it draws between this case and *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1 (1979), and *NCAA v. Board of Regents*, 468 U.S. 85 (1984), *see* Maj. Op. at 61-85 (Parts II.C.3-4), in reaching its conclusion that the rule of reason should apply.

[2] As noted by the majority, there are a few limited exceptions to the exclusivity agreement, including, for example, allowing Clubs to license their own trademarks on hot dogs and similar items sold within their home broadcasting territory. *See* Maj. Op. at 11-12. Notwithstanding these narrow exceptions, nearly all retail products containing the intellectual property of Major League Baseball or the Clubs must be licensed through MLBP.

eliminates price competition between the Clubs for trademark licenses. An agreement to eliminate price competition from the market is the essence of price fixing. *See, e.g.*, *United States v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969).

Nevertheless, the majority contends that this "so-called 'price' restriction is not in fact an agreement on 'price' but rather an agreement for the sharing of profits." Maj. Op. at 60; *see also id.* at 58-61 (Part II.C.2). Were the majority correct, competing companies could evade the antitrust laws simply by creating a "joint venture" to serve as the exclusive seller of their competing products. So long as no agreement explicitly listed the prices to be charged, the companies could act as monopolists through the "joint venture," setting prices together for their competing products, because the majority would categorize these actions formalistically as only an agreement to share profits. The antitrust laws are not so rigid as to permit such easy evasion.

Explicit price agreements have long been unnecessary for a price restraint to be *per se* unlawful. *See, e.g.*, *United States v. Gen. Motors Corp.*, 384 U.S. 127, 142-43 (1966); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809-10 (1946). Indeed, the mere agreement among competitors to exchange price information is a *per se* price-fixing violation. *See Container Corp.*, 393 U.S. at 334-38; *see also, e.g.*, *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 650 (1980) (per curiam) (holding agreement among wholesale beer sellers to make retailers pay in cash was *per se* illegal); *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692-93 (1978) (holding agreement among engineers to refuse to discuss prices with potential customers until after the initial selection of an engineer was *per se* illegal); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222-24 (1940) (holding agreement among competitors to buy surplus gasoline was *per se* illegal). The majority's analysis is at odds with this precedent because the majority appears to require an agreement explicitly indicating

a price before that agreement may be considered a *per se* illegal price restraint.[3]  No such rigid requirement is necessary.

The law remains that any "combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se." *Socony-Vacuum Oil Co.*, 310 U.S. at 223.  Thus, the antitrust laws prohibit two companies A and B, producers of X, from agreeing to set the price of X.  Likewise, A and B cannot

---

[3] The majority also implies that MLBP's choice to set a royalty rate rather than a uniform price or "sum certain" is somehow less problematic for antitrust purposes, believing that MLBP's licensing fees are "entirely responsive to the preferences of licensees and retail product consumers." Maj. Op. at 72-74.  Such a distinction between royalty rates and uniform prices is meaningless.  First, for purposes of the Sherman Act, prices "are fixed because they are agreed upon," whether it be in the form of a uniform price or a price set by formula. *Socony-Vacuum Oil Co.*, 310 U.S. at 222.  Competitors who agree to fix royalty rates, no less than competitors who agree to fix a single uniform price, violate the Sherman Act.  MLBP's expert does not even contest that it has fixed a single price in this case. *See* Fisher Report ¶ 29-30 ("MLBP has chosen to set a single price (or royalty rate) irrespective of the popularity of a Club . . . .").  Second, whether or not an agreed upon price is responsive to consumer demand is irrelevant. *See Socony-Vacuum Oil Co.*, 310 U.S. at 222-23 ("[T]he fact that, as here, [prices] are fixed at the fair going market price is immaterial.  For purchases at or under the market are one species of price-fixing.").  The antitrust laws seek to ensure that the determination of price is by free competition alone; the reasonableness of an agreed upon price is not a defense. *See id.* at 223; *Catalano, Inc.*, 446 U.S. at 647.

Furthermore, the majority incorrectly believes that the licensing fees are "entirely responsive" to demand.  A simple example displays the majority's fallacy.  Take Club C, a Club that has two fans A and B.  A is willing to pay $15 for a Club C hat while B is willing to pay $12 for the same hat.  Assume that Producer P will sell Club C hats at its marginal cost to produce them of $10 and assume that MLBP charges a 20% license fee.  Under this scenario, the price for a licensed hat would be $12.50 (price = $10 /(1 – 0.20)), and only A would be willing to buy a Club C hat.  However, if Club C was pricing its own licenses, it could drop the license fee to 15%, in which case both A and B would be willing to buy Club C hats for $11.76, and licensing revenue for Club C would increase from $2.50 to $3.52.  As this example shows, the licensing fees here are not totally responsive to consumer demand.  Basic principles of economics teach us that as royalty rates increase, the price for licensed goods will increase, and output will decline as fewer consumers are willing to purchase licensed goods at higher prices.  This is Salvino's central contention—that if the Clubs were forced to compete with each other for licensing fees, they would offer licenses at lower rates, thereby resulting in lower prices (and increased output) for licensed goods.

simply get around this rule by agreeing to set the price of X through a third-party intermediary or "joint venture" if the purpose and effect of that agreement is to raise, depress, fix, peg, or stabilize the price of X. *See Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 598 (1951) ("Nor do we find any support in reason or authority for the proposition that agreements between legally separate persons and companies to suppress competition among themselves and others can be justified by labeling the project a 'joint venture.'"), *overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.*, 469 U.S. 752 (1984); *see also* Federal Trade Comm'n & U.S. Dep't of Justice, *Antitrust Guidelines for Collaborations Among Competitors* 9 (2000) ("[L]abeling an arrangement a 'joint venture' will not protect what is merely a device to raise price or restrict output . . . ."). In other words, an agreement between competitors to "share profits" or to make a third party the exclusive seller of their competing products that has the *purpose* and *effect* of fixing, stabilizing, or raising prices may be a *per se* violation of the Sherman Act, even if no explicit price is referenced in the agreement.

The present dispute is significantly more complex than two competitors creating a "joint venture" for the sole purpose of fixing prices. Here, the MLBP joint venture offers substantial efficiency-enhancing benefits that the individual Clubs could not offer on their own, including decreased transaction costs on the sale of licenses, lower enforcement and monitoring costs, and the ability to one-stop shop (i.e., to purchases licenses from more than one Club in a central location). These procompetitive benefits, MLBP maintains, could not exist without the exclusivity and profit-sharing agreements, the two provisions challenged by Salvino as price fixing. In other words, MLBP argues that even if the effect of the exclusivity and profit-sharing agreements is to eliminate price competition between the Clubs, the purpose of these agreements is to achieve other significant

procompetitive benefits, which outweigh any harm from the price restraint.[4]  We must decide then whether the Clubs' agreement not to compete with each other on price, which is price fixing in a literal sense, should nevertheless be reviewed under a rule of reason in light of MLBP's other efficiency-enhancing benefits.  *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 8-9 (1979) (rejecting application of the *per se* rule to every situation where there is literal price fixing because "[l]iteralness is overly simplistic and often overbroad" and explaining that "'price fixing' is a shorthand way of describing certain categories of business behavior to which the *per se* rule has been held applicable").  For the reasons described below, I join with the majority in concluding that neither a *per se* nor a quick-look approach is appropriate here, but I apply a substantially different framework than the majority in reaching my conclusion.[5]

Recognizing that joint ventures "hold the promise of increasing a firm's efficiency and enabling it to compete more effectively," the Supreme Court has concluded that joint ventures should normally be analyzed under a rule of reason, requiring an inquiry into market power and structure and the actual effects of any restraints on trade.  *Copperweld Corp.*, 467 U.S. at 768; *see also Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 295-98 (1985) (same).  "While joint ventures have no immunity from the antitrust laws . . . , a joint selling arrangement may 'mak[e] possible a new product by reaping otherwise unattainable efficiencies.'"  *NCAA v. Bd. of Regents*, 468 U.S. 85, 113 (1984).  Accordingly, competitors engaged in joint ventures may be

---

[4] MLBP further argues that eliminating price competition between the Clubs causes no harm to the market because the Clubs must compete with a wide array of entertainment entities, including other sports leagues and entertainment companies, in the licensing of intellectual property, and therefore lack the market power necessary to affect prices.

[5] For a detailed explanation of the *per se*, quick look, and rule of reason methods of analysis under the Sherman Act, see Part II.B of the majority opinion.  *See* Maj. Op. at 48-54.

permitted to engage in a variety of activities that would normally be illegal under a *per se* rule when such activities are necessary to achieve the significant efficiency-enhancing purposes of the venture. For example, price fixing between competitors—generally a *per se* illegal restraint—may be justifiable in certain circumstances when done as part of a joint venture. *See Broad. Music*, 441 U.S. at 23. In short, to protect the efficiency-enhancing potential of joint ventures and cooperatives, the rule of reason is the favored method of analysis for these ventures, preventing courts from intervening before a full market analysis is completed.

Nevertheless, a *per se* or quick-look approach may apply to joint ventures in at least two situations: (1) where a joint venture is essentially a sham, offering no reasonable prospect of any efficiency-enhancing benefit to society, *see Addamax Corp. v. Open Software Found., Inc.*, 152 F.3d 48, 52 (1st Cir. 1998); and (2) where a particular challenged restraint is not reasonably necessary to achieve any of the efficiency-enhancing benefits of a joint venture and serves only as naked restraint against competition, *see Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188-89 (7th Cir. 1985). In such cases, a court may conclude that a joint venture or a challenged restraint is *per se* illegal where it has "manifestly anticompetitive effects." *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 127 S. Ct. 2705, 2713 (2007) (internal quotation marks omitted).

Because MLBP offers significant procompetitive benefits, Salvino does not seriously contend that MLBP as a whole is so manifestly anticompetitive that it should be considered a sham cartel. *Cf. Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990) (per curiam) (holding an agreement between bar review course providers dividing market territories and sharing revenue was a *per se* violation). Rather, Salvino argues for a *per se* or quick-look approach under the second scenario, maintaining that the exclusivity and profit-sharing provisions of the MLBP agreement are not necessary to achieve any of MLBP's procompetitive advantages and serve no purpose but to stifle competition. As Salvino

explains, "Without the exclusivity requirement, potential licensees would have the freedom to either seek out each team for individualized arrangements or deal with all teams through the centralized agency of MLBP." Accordingly, Salvino asks us to separate these two provisions from the rest of the joint venture and to conclude that they are so plainly anticompetitive as to be *per se* illegal. Because the provisions are reasonably necessary to achieve MLBP's efficiency-enhancing objectives, I conclude that they should be analyzed as part of the joint venture using a rule-of-reason analysis.

Joint ventures are typically evaluated as a whole under the rule of reason because the competitive effects of an individual restraint are intertwined with the effects of the remainder of the venture. However, under the doctrine of ancillary restraints, when a challenged restraint is not reasonably necessary to achieve any of the efficiency-enhancing purposes of a joint venture, it will be evaluated apart from the rest of the venture. *See, e.g.*, *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1151 (9th Cir. 2003); *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 970 (10th Cir. 1994); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986); *Polk Bros.*, 776 F.2d at 189; *In re Polygram Holding, Inc.*, Docket No. 9298, 2003 WL 21770765 (F.T.C. 2003). *See generally* Federal Trade Comm'n & U.S. Dep't of Justice, *Antitrust Guidelines for Collaborations Among Competitors* (2000); Gregory J. Werden, *Antitrust Analysis of Joint Ventures: An Overview*, 66 Antitrust L.J. 701 (1998). This doctrine seeks to distinguish between those restraints that are intended to promote the efficiencies of a joint venture and those that are simply unrelated.[6] As the Seventh Circuit explained:

A court must distinguish between "naked" restraints, those in which the restriction on

[6] The doctrine of ancillary restraints has its roots in an 1898 opinion by then-Judge Taft. *See United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 280-83 (6th Cir. 1898), *aff'd*, 172 U.S. 211 (1899). The principle has been adapted over the last few decades to the context of joint ventures, as noted in the cases cited above.

> competition is unaccompanied by new production or products, and "ancillary" restraints, those that are part of a larger endeavor whose success they promote. If two people meet one day and decide not to compete, the restraint is "naked"; it does nothing but suppress competition. If A hires B as a salesman and passes customer lists to B, then B's reciprocal covenant not to compete with A is "ancillary." At the time A and B strike their bargain, the enterprise (viewed as a whole) expands output and competition by putting B to work. The covenant not to compete means that A may trust B with broader responsibilities, the better to compete against third parties. Covenants of this type are evaluated under the Rule of Reason as ancillary restraints, and unless they bring a large market share under a single firm's control they are lawful.

*Polk Bros.*, 776 F.2d at 188-89 (internal citation omitted). The doctrine recognizes that a restraint that is unnecessary to achieve a joint venture's efficiency-enhancing benefits may not be justified based on those benefits. Accordingly, a challenged restraint must have a reasonable procompetitive justification, related to the efficiency-enhancing purposes of the joint venture, before that restraint will be analyzed as part of the venture. If none exists, the challenged restraint must be evaluated on its own and may be *per se* illegal even if the remainder of the joint venture is entirely lawful.[7] *Cf. Blackburn v. Sweeney*, 53 F.3d 825, 828-29 (7th Cir. 1995) (applying the *per se* rule to a provision in a law partnership dissolution agreement that restrained the territories where former partners could advertise after finding the provision to be non-ancillary to the rest of the agreement). In contrast, where a restraint *is* reasonably necessary to achieve a joint venture's efficiency-enhancing purposes (i.e., ancillary), it will be analyzed under the rule of reason as part of the joint venture because the effects of that restraint are not so plainly anticompetitive as to make a *per se* or quick-look approach

---

[7] However, a non-ancillary restraint is not necessarily unlawful or evaluated under a *per se* rule; rather, it is simply evaluated independent of the joint venture because its competitive effects are irrelevant to the joint venture and vice versa. Conversely, an ancillary restraint is not necessarily lawful. Its competitive benefits and harms must still be weighed, as part of the joint venture, under a rule-of-reason analysis. *See Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1102 (1st Cir. 1994).

appropriate.[8]

In this case, the exclusivity and profit-sharing provisions of the MLBP agreement are reasonably necessary to achieve MLBP's efficiency-enhancing purposes because they eliminate several potential externalities that may otherwise distort the incentives of individual Clubs and limit the potential efficiency gains of MLBP. *See* Fisher Report at 31-37. Most notable of these externalities is the so-called free-rider problem. Because of the interdependence of the Clubs within the setting of a sports league, free riding would occur if one of the Clubs is able to benefit disproportionately from the actions of Major League Baseball or other Clubs in the licensing of products. *Id.* at 32-35. This may lead to inefficiencies because the Clubs' incentive to invest in the promotion and development of their intellectual property and other licensed products may be distorted. *Id.* Both MLBP and Salvino recognize that without the exclusivity and profit-sharing provisions, these externalities could diminish MLBP's efficiency gains.[9] Indeed, Salvino's own expert, Louis Guth, admitted in his deposition, when asked whether there would be more or less licenses without the

---

[8] Several courts and commentators have—I believe correctly—viewed *Broadcast Music* and *NCAA*, the two cases primarily relied upon by the majority, as implicit applications of the ancillary restraints analysis. *See, e.g.*, *Sullivan*, 34 F.3d at 1102; *Polk Bros.*, 776 F.2d at 189; *see also* XI Herbert Hovenkamp, *Antitrust Law* ¶¶ 1908b, 1908d, 1908e, at 253-58, 261-65 (2d ed. 2005). In *Broadcast Music*, the need to reach some pricing agreement was necessary in order to sell a blanket license; otherwise, the product would not have been possible at all. *See* 441 U.S. at 20-23. Consequently, the Court examined the venture as a whole, implicitly viewing the pricing restraint as ancillary. In contrast, the Court reviewed the television agreement in *NCAA* as a non-ancillary naked restraint, apart from the rest of the joint venture, because the Court could not find any reason for the agreement that would be reasonably necessary to achieve any of the efficiency-enhancing objectives of the NCAA. *See* 468 U.S. at 113-15; *see also Texaco Inc.*, 547 U.S. at 7 (citing *NCAA* as an application of the ancillary restraints doctrine).

[9] Salvino argues that "there are better ways to address" the externalities than these two challenged provisions. Whether the externalities could be eliminated in a substantially less restrictive manner is an inquiry that should generally be part of a rule-of-reason analysis rather than part of a *per se* or quick-look approach. *See, e.g.*, *Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1012 (6th Cir. 2005).

centralized control of MLBP, that he could not give a straight yes or no answer without empirical analysis because of these potential externalities. *See* Guth Dep. at 135-37. In other words, Guth conceded that the challenged provisions could have a procompetitive impact related to the efficiency-enhancing purposes of MLBP.[10] Under such circumstances, the challenged restraints must be viewed as ancillary to the joint venture and reviewed under the rule of reason in the context of the joint venture as a whole.[11] *See Rothery Storage*, 792 F.2d at 228 ("[E]limination of the free ride is an efficiency justification available to horizontal restraints that are ancillary to a contract integration.").

The majority spends considerable time analyzing the similarities and differences between this case and *Broadcast Music* and *NCAA*, some of which I agree with and some of which I do not. However, I believe the ancillary restraints framework is a superior method for analyzing the challenged restraints here because it effectively isolates when an exclusive arrangement should be reviewed under the rule of reason, as a reasonably necessary part of a joint venture, and when it should be reviewed as a naked restraint. Neither *Broadcast Music* nor *NCAA* offer much direct insight into

---

[10] Empirical analysis could ultimately show that the anticompetitive harms from the challenged provisions outweigh any procompetitive benefits. The point is simply that Salvino's expert recognized that empirical analysis is necessary to determine whether these provisions have a positive or negative competitive effect. When empirical analysis is required to determine a challenged restraint's net competitive effect, neither a *per se* nor a quick-look approach is appropriate because those methods of analysis are reserved for practices that "facially appear[] to be one[s] that would always or almost always tend to restrict competition and decrease output." *Broad. Music*, 441 U.S. at 19-20; *see also Texaco Inc.*, 547 U.S. at 7 n.3 (explaining that a quick-look analysis applies only where "business activities are so plainly anticompetitive that courts need undertake only a cursory examination before imposing antitrust liability").

[11] Salvino argues that the exclusivity and profit-sharing provisions are not essential to the success of MLBP. Even if true—one certainly could imagine MLBP prospering without these provisions—the analysis here is not altered. Under the ancillary restraints doctrine, a challenged restraint need not be essential, but rather only "reasonably ancillary to the legitimate cooperative aspects of the venture." *Freeman*, 322 F.3d at 1151; *see also Polk Bros.*, 776 F.2d at 189 (explaining that a restraint is ancillary if it *may* promote the success of the more extensive cooperation and will then be scrutinized under the rule of reason).

the treatment of exclusivity agreements, except to emphasize the anticompetitive dangers of exclusive arrangements. *See Broad. Music*, 441 U.S. at 23-24 (emphasizing that "individual composers and authors have neither agreed not to sell individually in any other market nor use the blanket license to mask price fixing in such other markets"); *NCAA*, 468 U.S. at 114 n.54 ("Ensuring that individual members of a joint venture are free to increase output has been viewed as central in evaluating the competitive character of joint ventures."). In my view, the exclusivity provision is the single most important distinguishing factor between this case and *Broadcast Music*, yet the majority offers little analysis of this distinction and no explanation as to how such an arrangement should be analyzed. Accordingly, while I ultimately agree with the majority that the rule of reason applies here, I reach my conclusion through a different path.

Having concluded that the rule of reason is appropriate in this case, I concur fully with the majority's rule-of-reason analysis and agree that summary judgment was properly awarded to MLBP. *See* Maj. Op. at 89-90. On the present record, Salvino has adduced no evidence of an "actual adverse effect on competition as a whole in the relevant market," *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 506-07 (2d Cir. 2004) (internal quotation marks omitted). As such, its Sherman Act claims must fail. As noted by the majority, we need not and do not decide whether a successful Sherman Act claim could have been brought against MLBP with a properly supported record, including whether the procompetitive justifications for the two challenged provisions could be achieved in a substantially less restrictive manner.